John David BALLARD, Plaintiff,

v.

James WOODARD, in his official capacity as Secretary of the Department of Corrections; Rae McNamara, in her official capacity as Director of the Division of Prisons; L.H. Cashion, in his official capacity as Superintendent of Mecklenburg II Prison Union; James Galyan, George Pope, C.H. Deese; in their official capacities as employees of Mecklenburg II Prison Unit; and Nella Linker, Defendants.

No. C-C-84-440-P.

United States District Court,
W.D. North Carolina,
Charlotte Division.

Aug. 1, 1986.

John David Ballard, pro se.

David E. Broome, Jr., Asst. Atty. Gen., State of N.C., Dept. of Justice, Raleigh, N.C., William McBlief, Womble, Carlyle, Sandridge & Rice, Winston-Salem, N.C., for defendants.

## MEMORANDUM OF DECISION AND ORDER

ROBERT D. POTTER, Chief Judge.

### I. INTRODUCTION

THIS MATTER is before the Court on the Motion of Defendant Nella Linker and the separate Motion of all other Defendants for summary judgment in their favor pursuant to Rule 56 of the Federal Rules of Civil Procedure.

The Plaintiff, who is representing himself, has never responded to the Defendants' Motions. The Clerk of Court attempted to serve him more than once at his last known address with this Court's Order filed February 14, 1986, in which the Court gave the Plaintiff notice of the Motions for summary judgment and explained to him the requirements for responding to those Motions pursuant to *Roseboro v. Garrison,* 528 F.2d 309 (4th Cir.1975). That Order, however, was returned to the Clerk of Court after each attempt. The Plaintiff has never notified the Clerk of a change of address.

The Plaintiff is a former prisoner who was incarcerated at the state confinement facility in Huntersville, North Carolina at the time of the challenged incidents alleged in his Amended Verified Complaint. A black male, he allegedly subscribes to the Muslim faith. He brought this action pursuant to 42 U.S.C. § 1983 and alleges that the Defendants physically forced him to submit to a test for tuberculosis by injection over his religious objections. He claims that the tuberculosis test violated his first amendment right to practice the Muslim religion; that unnecessary physical force was used to administer the test in violation of the eighth amendment; that prison administrators negligently hired "violent and unstable persons" as correctional officers; that prison officials negligently failed to develop and administer policies relating to corporal punishment; and that the Defendants conspired to violate his con-

stitutional rights in violation of 42 U.S.C. § 1983.

Rule 56 of the Federal Rules of Civil Procedure states that the Court may grant summary judgment if there is no genuine issue as to any material fact and the moving parties are entitled to judgment as a matter of law. The evidence presented to the Court, including any legitimate inference that may be drawn therefrom, is to be viewed in the light most favorable to the nonmoving party. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970). Even if the opposing party fails to submit counterevidence in the form of affidavits or otherwise as provided by the rule, summary judgment may only be entered "if appropriate." *See* Fed.R.Civ.P. 56(e). The Court "[i]n essence ... is obligated to search the record and independently determine whether or not a genuine issue of material fact exists." *Higgins v. Baker*, 309 F.Supp. 635, 639 (S.D.N.Y.1970).

## II. STATEMENT OF FACTS

According to the Plaintiff, he discovered on the morning of June 29, 1984, that all prisoners in the Mecklenburg II Prison in Huntersville, North Carolina where he was incarcerated would be required to submit to a tuberculosis test by injection that day. Deposition of Ballard, p. 14. The Plaintiff told Correctional Officer Watson that he did not want to submit to the test because he was Muslim and was fasting in observance of the month of Ramadan. Deposition of Ballard, p. 17. Ramadan is a holy month for Muslims during which they are required to refrain from injesting anything during the daylight hours. Deposition of Ballard, p. 90; Supplemental Affidavit of Muhammed Nubee, p. 2. Officer Watson directed the Plaintiff to get in line for the test and told him that they would discuss the matter when his time came to receive the test. Deposition of Ballard, p. 18.

When the Plaintiff reached the threshold of the office in which the test was being given, he could see Defendant Nurse Nella Linker, Prison Nurse Judy Proctor, De-fendant Lieutenant James Galyan, Defendant Sergeant George Pope, Officer Watson, Defendant Officer Deese, and several inmates waiting for their tests inside the office. Deposition of Ballard, p. 21. When Nurse Linker called the Plaintiff into the room to receive his injection, he responded by taking one step across the threshold and stating that he was a Muslim, that he was fasting, and that he did not want to take the test. Deposition of Ballard, pp. 22, 24. He claims that he spoke loudly enough for everyone in the room to hear what he was saying. Deposition of Ballard, p. 23.

According to the Plaintiff, Lieutenant Galyan said, "I don't care anything about your religion. I don't care what you are or who you are. This test was handed down through Raleigh, and you have no rights, and you will take this test even if we have to hold you down and give it to you by force." Deposition of Ballard, p. 23. The Plaintiff shook his head in response to Lieutenant Galyan's order to submit to the test. Deposition of Ballard, p. 24. When Sergeant Pope asked the Plaintiff why he was shaking his head, he again stated that he was Muslim, that he was fasting, and that he did not take medicine during the month of Ramadan. Deposition of Ballard, pp. 25–26. Lieutenant Galyan, however, allegedly said that he did not want any talking and ordered Officer Deese to lock the Plaintiff in a security room across the hall. Deposition of Ballard, p. 25.

Officer Deese escorted the Plaintiff to the security room and locked him inside alone. Deposition of Ballard, pp. 27–28. After the inmates whose names already had been called had been given their tests, Sergeant Pope called the Plaintiff to the door of the security room and told him that the test was for his and everyone else's good. Deposition of Ballard, p. 28. According to the Plaintiff, Lieutenant Galyan intervened and stated, "That's enough talking." Deposition of Ballard, p. 28. Lieutenant Galyan, Sergeant Pope, and Officers Deese and Watson entered the security room, and the Plaintiff again stated that he was Muslim, that he was fasting, and that

it was his right to refuse. Deposition of Ballard, p. 29. According to the Plaintiff, Lieutenant Galyan responded by again stating, "I don't care about your religion. You are going to take the test, it was given by Raleigh, and you will take this test even if it is by force." Deposition of Ballard, pp. 29–30.

Officer Deese handcuffed the Plaintiff at the direction of Lieutenant Galyan and allegedly yanked the chain between the bracelets, pulling the Plaintiff to the door of the security room. Deposition of Ballard, p. 31. When the Plaintiff objected to being pulled by the handcuffs, Officer Deese lightened his hold on the chain and the Plaintiff followed him back to the office where the test was being given. Deposition of Ballard, pp. 30–32.

When Nurse Linker approached the Plaintiff with a syringe, the Plaintiff dropped his head over his arm to protect it from being injected. Deposition of Ballard, p. 34. Lieutenant Galyan then put his arm around the Plaintiff from behind and, according to the Plaintiff, put him in a chokehold that prevented him from breathing or talking. Deposition of Ballard, pp. 34, 37. Officer Deese pulled the handcuffs toward his chest to hold the Plaintiff's arm out, and Sergeant Pope held the Plaintiff's arm steady while Nurse Linker injected him. Deposition of Ballard, pp. 34, 36. Sergeant Pope released the Plaintiff's arm as soon as it had been injected. Deposition of Ballard, p. 40.

According to the Plaintiff, Officer Deese continued to hold the handcuffs after Nurse Linker had injected him while Lieutenant Galyan twisted the Plaintiff's head and asked him, "Which hurts most? The needle or the choking?" Deposition of Ballard, p. 41; Amended Verified Complaint, ¶ 23. The Plaintiff also claims that the Lieutenant said to him, "I told you that you was going to take that test, and now you have got it. Now you can go down to the legal library and sue if you want to. I said that you were going to take it. I don't care anything about your religion." Deposition of Ballard, p. 40. Lieutenant Galyan then

allegedly shoved the Plaintiff forward and told the officers to let him go. Deposition of Ballard, pp. 40, 126. Officer Deese took the handcuffs off the Plaintiff and asked Lieutenant Galyan if he was going to lock him up. Deposition of Ballard, p. 40. Lieutenant Galyan replied, "No, turn him loose in the yard." Deposition of Ballard, p. 40. Accordingly, the guards released the Plaintiff and he left the office alone. Deposition of Ballard, pp. 41–42.

The Plaintiff was taken to a local emergency room that night because he claimed to be suffering pain in his neck, back, and wrists. Deposition of Ballard, pp. 52–54. After taking x-rays of the Plaintiff, the emergency room doctor told him that he had no fractures but that he may have pulled a ligament and have suffered some muscle strain. Deposition of Ballard, p. 55. The doctor advised him to follow up with the prison nurse the next day. Deposition of Ballard, p. 58. The Plaintiff contends that the doctor recommended that he take a neck brace, but that he said he did not want it because it choked him. Deposition of Ballard, p. 56. The doctor also recommended some medication, but the Plaintiff refused to take it. Deposition of Ballard, p. 57. He testified at his deposition that he did not want the medicine because he knew he had some "makeup days to make." Deposition of Ballard, p. 57.

The meaning of the Plaintiff's comment about needing to make up days became apparent when he later testified at his deposition that his observance of Ramadan would end a few days later than the traditional end of the month because he had "missed," or could not observe, a few days of his fast because of an ulcer. Deposition of Ballard, p. 91. He explained that he had broken his fast on two earlier occasions that month to eat a raw egg and drink milk to ease a peptic ulcer. Deposition of Ballard, pp. 93–94. Although he claimed that he broke his fast with the egg and milk only because it was an emergency and he was in pain, Deposition of Ballard, p. 122, he further admitted that it is permissible for a Muslim to break his fast during Ra-

madan to preserve his health. Deposition of Ballard, p. 123. It appears clear from the Plaintiff's deposition statements that he could "make up" any days he missed during Ramadan after the month was over if those days were missed because of a need to preserve his health.

The prison nurse, Judy Proctor, called the Plaintiff to her office the day after the challenged incident and gave him some Ben Gay ointment, which she told him to apply along with hot towels to his neck and back. Deposition of Ballard, pp. 58–59. The Plaintiff admitted at his deposition that he has not received any treatment for his alleged injuries since visiting Nurse Proctor, that his back feels all right now, that the swelling and the pain in his neck is gone, and that he has no trouble with his wrists. Deposition of Ballard, p. 112.

## III. INFRINGEMENT OF FIRST AMENDMENT RELIGIOUS RIGHTS

The Plaintiff alleges that his first amendment right to practice his religion was violated when he was forcibly tested for tuberculosis by injection while he was fasting in observance of Ramadan. He now claims that he would not have objected to the test if it had been given to him after sundown, but he did not so inform the prison officials at the time of the challenged incident. Deposition of Ballard, p. 120. He claims that he could not suggest that alternative, since Lieutenant Galyan would not allow any talking. Deposition of Ballard, pp. 120–121.

It is well-settled that "[i]n a prison context, an inmate does not retain those First Amendment rights that are 'inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system.'" *Jones v. North Carolina Prisoners' Union, Inc.*, 433 U.S. 119, 129, 97 S.Ct. 2532, 2540, 53 L.Ed.2d 629 (1977) (quoting *Pell v. Procunier*, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974)). The Supreme Court noted in *Jones, supra,* that

[b]ecause the realities of running a penal institution are complex and difficult, we have also recognized the wide-ranging deference to be accorded the decisions of prison administrators. We noted in *Procunier v. Martinez*, 416 U.S. 396, 405 [94 S.Ct. 1800, 1807, 40 L.Ed.2d 224] (1974):

"[C]ourts are ill equipped to deal with the increasingly urgent problems of prison administration and reform. Judicial recognition of that fact reflects no more than a healthy sense of realism. Moreover, where state penal institutions are involved, federal courts have a further reason for deference to the appropriate prison authorities." (Footnote omitted).

*Id.* 433 U.S. at 126, 97 S.Ct. at 2538. The Fourth Circuit has stated that "[a] restriction on prisoners' religious expression will not be deemed unconstitutional if the restriction is necessary to safeguard legitimate institutional and penological interests" and recognized that "correctional officials' appraisal of those interests command great deference on the part of the courts." *Barrett v. Virginia*, 689 F.2d 498, 501 (4th Cir.1982) (citations omitted).

In *Byrd v. Bennett*, 774 F.2d 1154 (4th Cir.1985) (unpublished), the Fourth Circuit recently reviewed a decision in which the District Court for the District of Maryland granted a Motion for summary judgment against a prisoner on his claim that the warden and nurse in the prison where he was incarcerated abridged his first amendment right to practice religion when they forcibly tested him for tuberculosis by injection of a pork-derivative medication in violation of his Islamic faith. The prisoner willingly offered to receive an x-ray test as an alternative to the injection, but the prison officials did not pursue that alternative.

In *Byrd*, the challenged injection was administered pursuant to a prison-wide testing program prompted by a directive from the Maryland State Health Department following the discovery of an active case of tuberculosis at the corrections facility. In affirming the trial court's award of

summary judgment in favor of the defendants, the Fourth Circuit noted:

> In granting summary judgment for defendants on this claim, the district court found that there was no allegation and no evidence that Byrd communicated his religious objections to the medical personnel at the time of the injection. The court concluded, however, that even assuming the medical pesonnel were aware of Byrd's religious concerns, and that the solution contained pork derivatives, any violation of Byrd's first amendment rights was overridden by the State's paramount interest in removing the health hazard created by the presence of tuberculosis at the corrections facility.
>
> ... In view of the State Health Department's directive to proceed with the testing of all inmates and staff for tuberculosis and considering the communicable nature of the disease, we believe the prison officials acted reasonably and responsibly in moving swiftly to avert possible spread of the disease. Indeed, it is clear that prison officials have an affirmative duty to provide the necessary and proper medical care to prisoners, *Estelle v. Gamble*, 429 U.S. 97, 103 [97 S.Ct. 285, 290, 50 L.Ed.2d 251] (1976). Thus, the failure to do so regardless of consent could amount to a deliberate indifference to an inmate's serious medical needs, giving rise in itself to a constitutional claim. Here, the administration of the injection over the objections of Byrd did not constitute the denial of any federal constitutional rights. *See Haynes v. Harris*, 344 F.2d 463, 464–65 (8th Cir.1965).
>
> In the present circumstances, the prison officials faced a significant and real danger of the spread of tuberculosis. Even were we to accept as true the allegations of fact contained in Byrd's religious objections, they would not serve as adequate justification for this court's incursion into the State's predominant interest and responsibility in maintaining the health of its prison population.

Slip Op. at 6–8.

In the present case, the testing that the Plaintiff resisted was conducted pursuant to the Division of Prison's mandatory annual tuberculin skin testing program, which Defendant Rae McNamara, Director of the Division of Prisons, ordered to be carried out on two specific dates in June 1984 throughout the entire prison system in North Carolina. According to Pat Kennedy, Tuberculosis Program Chief for the Mecklenburg County Health Department, the Division of Prisons has implemented this annual preventive testing program because "[t]he risk of contracting tuberculosis in a prison is significantly greater than the risk for the population at large...." Affidavit of Kennedy, ¶ 5.

█ Even though the Plaintiff's testing was not prompted by the discovery of an active case of tuberculosis within the prison as was the case in *Byrd, supra,* the Court believes that the Fourth Circuit's reasoning in *Byrd* applies with sufficient force in the present case to lead this Court to the same conclusion that was reached in *Byrd.* Thus, even assuming that the Plaintiff informed the Defendants directly involved in the testing that the injection would violate his religious fast, and even assuming that the Plaintiff would have told them that he would be willing to take the test after sundown if Lieutenant Galyan had given him a chance to talk, the Court finds that any violation of the Plaintiff's first amendment rights was overridden by the State's paramount interest in maintaining the health of its prison population. Because the Court is of the opinion that orderly and uniform implementation of the preventive testing program was necessary to safeguard legitimate institutional and penalogical interests, it finds that the restriction on the Plaintiff's practice of religion was not unconstitutional. *See Barrett v. Virginia, supra,* at 501.

For the foregoing reasons, the Court concludes that all Defendants are entitled to judgment in their favor as a matter of law as to the Plaintiff's first amendment claim of infringement of his right to practice his religion.

## IV. UNCONSTITUTIONAL USE OF FORCE

The Plaintiff admitted at his deposition that the only Defendants who used any force against him during the challenged incident were Lieutenant Galyan and Officers Pope and Deese. Deposition of Ballard, pp. 34–41. He further admitted that of these Defendants, the only ones who hurt him or intended to hurt him were Lieutenant Galyan and Officer Deese. Deposition of Ballard, p. 65. These admissions automatically entitle all other Defendants to judgment in their favor on the Plaintiff's claim of unconstitutional use of force.

The Fourth Circuit recently declared in *Justice v. Dennis*, 793 F.2d 573, 576–77 (4th Cir.1986), that "[t]he fundamental inquiry in all excessive force cases, regardless of the protected interest's fourth, fifth, or eight amendment origins, is whether the degree of force was necessary to protect a legitimate state interest, and permissible under all the circumstances." The Court noted that "[w]hile force sufficient for a state tort claim does not necessarily rise to a constitutionally violative level, *see Daniels v. Williams*, —— U.S. ——, 106 S.Ct. 662, 666 [88 L.Ed.2d 662] (1986), at some point the force is so disproportionate to the circumstances that it is constitutionally tortious." *Id.* at 576. Factors that the Court considered relevant to the factfinder's assessment of disproportionality "include, but are not limited to, the need for force, the degree of force applied, the injuries inflicted, and totality of circumstances surrounding the use of force." *Id.*

Another factor that may be considered is "'whether force was applied in a good faith effort to maintain or restore discipline or malicious and sadistically for the very purpose of causing harm.'" *King v. Blankenship*, 636 F.2d 70, 73 (4th Cir.1980) (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.1973)). The Court in *Johnson v. Glick, supra,* at 1033, noted that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitu-

tional right." The factfinder must keep in mind, however, that while "[p]roof of malice will elevate the common law causes of action to constitutional torts, [it] is not required to prove a constitutional tort." *Ladnier v. Murray*, 769 F.2d 195, 199 n. 4 (4th Cir.1985). Recklessness, wantoness, or gross and culpable negligence may also be sufficient for a § 1983 excessive force claim. *Justice, supra,* at 578.

■ In the present case, force was used by Defendants Deese, Galyan, and Pope only after the Plaintiff, by his own admission, physically interfered with the administration of the tuberculosis test. The Court has already found that the State's interest in preventing health problems in its prison system is so compelling that it overrides this prisoner's first amendment religious rights. Thus, the Court finds as a matter of law that force was used in this case the course of protecting a legitimate state interest.

■ Except with respect to Officer Pope, however, the Court cannot say as a matter of law that the actions of the Defendants the Plaintiff claims used force against him during the testing did not rise to the level of constitutional torts. The Plaintiff's allegations against Deese, who purportedly "yanked" the Plaintiff's handcuffs to his chest to keep the Plaintiff's arms extended *and* to inflict pain on the Plaintiff, and against Galyan, who purportedly choked the Plaintiff and cut off his breathing, present cognizable claims that should be submitted to the jury for assessment with the Defendant's evidence under the factors noted above. *See Justice v. Dennis, supra.* On the other hand, Officer Pope merely steadied the Plaintiff's arm while Nurse Linker injected it; the Plaintiff admitted that Pope did not hurt him or try to hurt him. Without any further aggravating circumstances, no reasonable person could find that Pope's minor contact with the Plaintiff's arm was so disproportionate to the force necessary to enable Linker to inject the Plaintiff that it constituted cruel and unusual punishment.

Thus, the Plaintiff's claim based on unconstitutional use of force should be dismissed as a matter of law as against all Defendants but Galyan and Deese.

## V. NEGLIGENCE CLAIMS

█ The Plaintiff alleges that the Defendants have deprived him of the rights, privileges, and immunities secured to him by the United States Constitution by negligently selecting, giving responsibility to, and failing to control correctional officers whom the Defendants knew or should have known had unstable personalities and violent tendencies and by negligently failing to effectuate and/or administer policies concerning corporal punishment.

The United States Supreme Court recently held in *Daniels v. Williams*, — U.S. —, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986), that "the Due Process Clause is simply not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty or property." Thus, the Plaintiff's claims against the Defendants based on negligence are not cognizable under § 1983 and judgment should be entered in the Defendants' favor on these claims as a matter of law.

## VI. CONSPIRACY

█ The Plaintiff claims in his Amended Verified Complaint that the Defendants conspired to deny him of the rights, privileges, and immunities secured to him by the Constitution and laws of the United States in violation of § 1983. The Plaintiff admitted at his deposition, however, that he had never given any consideration to whether the Defendants planned the challenged incident before it happened and simply "doesn't know" anything about any alleged plan. Deposition of Ballard, p. 133. Since the Plaintiff has presented no evidence and indeed admits that he knows of no evidence that would tend to show that the Defendants acted pursuant to a plan, his conspiracy claim must fail. *See Slotnick v. Staviskey*, 560 F.2d 31, 33 (1st Cir.1977) ("It has long been the law in this and other circuits that complaints cannot survive a motion to dismiss if they contain conclusory allegations of conspiracy but do not support their claims with references to material facts.").

## VII. CONCLUSION

For the foregoing reasons, the Court is of the opinion that Defendant Linker's Motion for summary judgment should be granted as to all claims against her. The Court further believes that the Motion of Defendants Galyan and Deese for summary judgment should be granted on all claims except the Plaintiff's claim for compensatory and punitive damages for Galyan's and Deese's alleged unconstitutional use of force against him. Finally, the Court is of the opinion that the remaining Defendants are entitled to summary judgment in their favor as to all of the Plaintiff's claims.

NOW, THEREFORE, IT IS ORDERED that:

(1) Defendant Linker's Motion for summary judgment pursuant to Fed.R. Civ.P. 56 is *GRANTED;*

(2) The Motion of Defendants Woodard, McNamara, Cashion, and Pope for summary judgment pursuant to Fed. R.Civ.P. 56 is *GRANTED;*

(3) The Clerk is directed to place the Plaintiff's claim for compensatory and punitive damages against Defendant Galyan and Deese for their alleged unconstitutional use of force against him on the next Jury Trial Calendar in Charlotte, North Carolina; and

(4) The Motion of Defendants Galyan and Deese for summary judgment as to all other claims in the Plaintiff's Complaint is *GRANTED* pursuant to Fed.R.Civ.P. 56.