**Paul JOLLY, Plaintiff,**

v.

**Thomas COUGHLIN; Robert Greifinger; John P. Keane; C. Greiner; S. Kapoor, Defendants.**

**No. 92 Civ. 9026 (JGK).**

United States District Court, S.D. New York.

Aug. 14, 1995.

---

Paul Jolly, pro se.[1]

Dennis C. Vacco, Attorney General of the State of New York, Barbara K. Hathaway, Assistant Attorney General, New York City, for defendants.

## OPINION AND ORDER

KOELTL, District Judge:

This case presents a conflict between the enforcement of a mandatory tuberculosis (or "TB") screening program instituted by the New York State Department of Correctional Services ("DOCS") and the demonstrated religious convictions of a prison inmate who has refused to submit to the screening test. The plaintiff, who is twenty-eight years old and who has been confined in medical keeplock since he refused to take the test on December 10, 1991, has sued the defendants claiming, among other things, that their treatment of him violates both his right to the free exercise of religion under the Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. § 2000bb *et seq.*, and his right to be free from cruel and unusual punishment under the Eighth Amendment of the United States Constitution. The plaintiff has moved for a preliminary injunction, seeking to be released from medical keeplock during the pendency of this action.

### I.

In response to the relatively recent resurgence of tuberculosis, DOCS developed a comprehensive TB Control Program (or "Program") in 1991 based on recommendations from the Department of Health and the Centers for Disease Control of the United States Public Health Service. (Defs.' Mem. Opp'n Mot. at 3; Greifinger Aff. of 12/1/93 at ¶ 5.) The Program requires mandatory screening for TB at least annually by means of a Purified Protein Derivative ("PPD") test.

(Defs.' Mem.Opp'n Mot. at 4; Greifinger Aff. of 12/1/93 at ¶ 8.)

Tuberculosis is a disease caused by the bacteria Mycobacterium Tuberculosis. (Greifinger Depo. at 17.) The bacteria can infect a person and exist in the person's body for a period of time without the person's immediately developing the disease; this is called latent tuberculosis, which is not contagious under normal circumstances. (*Id.* at 17–18.) Without preventive treatment, eight percent of persons with latent TB eventually will develop the active disease and may become contagious. (Greifinger Aff. of 12/1/93 at ¶ 3; Defs.' Mem.Opp'n Mot. at 3.)

Active tuberculosis, which is contagious, is a condition where the bacteria begin to multiply and break down the tissues of the body. (Greifinger Depo. at 19.) The symptoms of active tuberculosis include persistent coughing, night sweats, fever and weight loss. (*Id.* at 19, 41.) The disease is spread by close and prolonged contact with a person who has the active disease and the presence of susceptible hosts for the bacteria, including people who are malnourished or who are suffering from immune deficiencies, creates an increased risk for the spread of TB; prisons, which are congregate settings, present an obvious and increased risk of TB transmission. (Greifinger Aff. of 12/1/93 at ¶¶ 2–4.)

The PPD test consists of an injection of a small amount of purified protein into the skin. (*Id.* at ¶ 11.) A "positive" test, indicated by a skin reaction, or induration, in the area of the injection signifies that a person has been exposed to tuberculosis and has at least latent TB, which is not contagious. (*Id.* at ¶¶ 11, 13.) However, the PPD test has a significant rate of error. The test produces up to two percent false positives and up to ten percent false negatives. (Greifinger Depo. at 26.)

The Program does not require that inmates who test positive necessarily undergo any treatment or that they be placed in respiratory isolation. Rather, when an inmate tests positive, the inmate is given a

1. Gibson, Dunn & Crutcher represented the plaintiff on a *pro bono* basis throughout the briefing of the motion that is the subject of this opinion. However, due to problems in communication between the plaintiff and his counsel, the Court granted the plaintiff's application that his counsel be relieved by order dated July 25, 1995.

chest x-ray to determine whether the inmate has active TB. (Greifinger Aff. of 12/1/93 at ¶ 13.) If the inmate does not have active TB, the inmate is encouraged to take oral doses of Isoniazid ("INH"), which is a preventive treatment; however, INH therapy is not required. (Greifinger Depo. at 47–48, 50.) Moreover, an inmate who tests positive, but who demonstrates no clinical symptoms of active TB and who takes the INH therapy, is permitted to return to the general prison population. (*Id.* at 47–51.) Also, an inmate who tests positive, has a normal chest x-ray, does not exhibit any clinical symptoms of active TB and who refuses INH therapy is permitted to return to the general population. (*Id.*) And, an inmate who tests positive, who has been in known contact with a source of active TB, who refuses to take a chest x-ray, but who demonstrates no clinical symptoms of TB also is allowed to return to the general population. (*Id.* at 53–54.) Only inmates who have a positive sputum culture, an abnormal chest x-ray or suspicious clinical symptoms, indicating active TB, are placed in respiratory isolation. (*Id.* at 51–52, 54.)

The TB Control Program requires that an inmate who refuses to submit to a PPD test be placed in medical keeplock. (Exh. 1 to Greifinger Aff. of 12/1/93 at 3.) Inmates who are in medical keeplock remain in their cells at all times, except for the time they are permitted for one shower per week. (*Id.*) These inmates are permitted visits by their attorneys, but they are not permitted visits by anyone else. (*Id.*) They are not allowed out of their cells for any exercise unlike inmates who are in special housing units for reasons including disciplinary problems; inmates in special housing units are permitted one hour per day of exercise. (Pl.'s Second Amended Compl. at ¶ 38.)

Medical keeplock is not the same as respiratory isolation. (Greifinger Depo. at 95.) Inmates in medical keeplock are not kept isolated from the breathing space of the general population; accordingly, when they are permitted to go to the shower, they do not wear masks and their visits with attorneys are in the general visiting room. (*Id.* at 95; Procas Aff. of 3/8/95 at ¶ 3.) This is because these inmates are not considered to pose any risk of contagious tuberculosis. (Greifinger Depo. at 95.)

Mandatory TB screening was implemented by DOCS in November and December of 1991. (Defs.' Mem.Opp'n Mot. at 6.) In December, 1991, the plaintiff, who then was incarcerated at the Sing Sing Correctional Facility, refused to submit to the PPD test, claiming that doing so would violate his religious beliefs. (Jolly Aff. of 3/7/95 at ¶ 6; Pl.'s Mem.Supp.Mot. at 6.) The plaintiff has practiced the Rastafarian religion since March, 1991. (Jolly Aff. of 3/7/95 at ¶ 2.) He has explained that the reason he believes that submitting to the PPD test would violate his religious beliefs is because, under the tenets of his religion, "accepting artificial substances into the body constitutes a sin and shows profound disrespect to our Creator." (*Id.* at ¶ 3.)

As a result of the plaintiff's refusal to take the test and pursuant to the TB Control Program, the plaintiff was placed in medical keeplock on December 10, 1991. (*Id.* at ¶¶ 6–7.) He has remained there ever since, except for one week in the general population at Wande Prison in May, 1994. (*Id.* at ¶ 7.). As a result of his prolonged confinement, the plaintiff alleges that he cannot stand up to go to the shower and he has developed various physical problems including rashes, severe headaches, shortness of breath and hair loss. (*Id.* at ¶ 13.)

The plaintiff has never displayed any symptoms of active tuberculosis. (*Id.* at ¶ 15.) Prior to the plaintiff's becoming a Rastafarian, he took a PPD test and was told that it was negative. (*Id.* at ¶ 5.) Moreover, he has had three x-rays since 1991 to determine whether he has active tuberculosis; he has never, after any of these x-rays or at any time, been placed in respiratory isolation. (*Id.* at ¶ 14.)

The plaintiff, who currently is in medical keeplock in Attica Correctional Facility, seeks a preliminary injunction releasing him from medical keeplock pending the trial of his case.[2]

---

**2.** This case was reassigned to this Court on February 28, 1995. At that time, the parties were

## II.

In order to obtain a preliminary injunction in most cases, a party must demonstrate irreparable harm and either (1) a likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of the hardships tipping decidedly in favor of the party requesting the preliminary injunction. *Waldman Publishing Corp. v. Landoll, Inc.*, 43 F.3d 775, 779–80 (2d Cir.1994) (citing, *inter alia, Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979)); *Blum v. Schlegel*, 18 F.3d 1005, 1010 (2d Cir.1994) (same). However, when a plaintiff seeks to stay government action taken in the public interest pursuant to a statutory or regulatory scheme, the moving party is required to meet the more rigorous of these tests and demonstrate irreparable harm and a likelihood of success on the merits. *Catanzano v. Dowling*, 60 F.3d 113, 117–18 (2d Cir.1995); *Plaza Health Labs., Inc. v. Perales*, 878 F.2d 577, 580 (2d Cir.1989).

Here, it is appropriate to apply this heightened standard because the plaintiff has challenged the way the defendants have enforced a program that was adopted to advance the public interest in protecting inmates and DOCS staff, and the members of the public with whom they come into contact, from a potentially fatal disease. *See Payne v. Coughlin*, 93 Civ. 3378, Report and Recommendation, slip op. at p. 7 (S.D.N.Y. Oct. 12, 1994) (Grubin, M.J.) (citing *Plaza Health*, 878 F.2d at 580). While the plaintiff has not conceded that this standard is the appropriate one to be applied, he has argued that even under this standard, the Court should grant his motion. For the reasons discussed below, the Court agrees.

Moreover, while the plaintiff's motion for a preliminary injunction properly is viewed as seeking a prohibitory injunction because it seeks to prohibit the defendants from keeping the plaintiff in medical keeplock, rather than a mandatory injunction, *see Tom Doherty Assocs., Inc. v. Saban Entertainment*, 60 F.3d 27, 33–35 (2d Cir.1995); *see also Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025–26 (2d Cir.1985), the plaintiff has satisfied the stricter test for mandatory injunctions. In *Tom Doherty Assocs.*, the Court of Appeals explained that a party seeking a preliminary injunction must meet a heightened standard where that party seeks an injunction that either will alter the status quo, i.e., a mandatory injunction, or that will provide the movant with substantially all the relief sought where such relief cannot be undone even if the non-moving party prevails at a trial on the merits. *Tom Doherty Assocs.*, 60 F.3d at 33–34. In either of these situations, the party seeking the preliminary injunction must meet the higher standard of "substantial, or clear showing of, likelihood of success" on the merits to obtain preliminary relief. *Id.* at 33–35. Here, the preliminary injunction only will prevent the defendants from keeping the plaintiff in medical keeplock during the pendency of this action until a final decision is reached on the merits. It is not the equivalent of granting ultimate relief and, if the plaintiff does not prevail on the merits, he could be returned to medical keeplock.

In any event, as discussed above, the Court already has applied a heightened standard because of the public interest implicated by the plaintiff's motion. Therefore, it has required the plaintiff to demonstrate a likelihood of success on the merits and not simply serious questions concerning the merits and a balance of the hardships tipping decidedly in his favor. Moreover, even if the Court were to apply the even higher standard for mandatory injunctions, the plaintiff also would satisfy that test because, as discussed below, the plaintiff has made a substantial and clear showing of a likelihood of success on the merits.

---

engaged in discovery and they expressed their intention to make motions for summary judgment before Magistrate Judge Leonard Bernikow in addition to this motion for a preliminary injunction. Given the urgency of the situation presented by the facts of the case, the Court determined that it should hear the preliminary injunction motion, instead of Magistrate Judge Bernikow, in order to avoid the necessary additional appeal from Magistrate Judge Bernikow's report and recommendation if either party decided to appeal the decision on the preliminary injunction.

### III.

■ The plaintiff has demonstrated that irreparable injury will result if the Court denies his motion because he has alleged a constitutional violation, as well as harm that could not adequately be compensated monetarily. *See Covino v. Patrissi,* 967 F.2d 73, 77 (2d Cir.1992) (alleged possible deprivation of a constitutional right constitutes irreparable harm for purposes of a preliminary injunction) (citing *Mitchell v. Cuomo,* 748 F.2d 804, 806 (2d Cir.1984)); *Paulsen v. County of Nassau,* 925 F.2d 65, 68 (2d Cir.1991) ("[I]mproper conduct for which monetary remedies cannot provide adequate compensation suffices to establish irreparable harm.") (citing *Jackson Dairy,* 596 F.2d at 72). The plaintiff satisfies the irreparable harm requirement with his showing, in support of his motion, that his rights under RFRA and the Eighth Amendment of the United States Constitution likely have been violated.[3] Moreover, it is apparent that, after three and a half years in medical keeplock and with increasing physical manifestations of the effects of such confinement including the plaintiff's inability to stand to go to the shower, rashes, severe headaches, shortness of breath and hair loss, (Jolly Aff. of 3/7/95 at ¶ 13), the plaintiff is suffering irreparable injury.

### IV.

RFRA provides a statutory claim or defense to persons whose religious exercise is substantially burdened by the government. *See* 42 U.S.C. § 2000bb(b).[4] RFRA purports to restore the compelling state interest test to facially neutral laws of general applicability that substantially burden the free exercise of religion, a test that had been modified by the Supreme Court's decision in *Employment Div., Dep't of Human Resources of Oregon v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990).

Prior to 1990, the Supreme Court subjected laws that burdened the free exercise of religion to the strictest level of scrutiny under which such laws had to be narrowly tailored to serve compelling state interests. *See, e.g., Wisconsin v. Yoder,* 406 U.S. 205, 215, 234, 92 S.Ct. 1526, 1533, 1542, 32 L.Ed.2d 15 (1972) (The Free Exercise Clause of the First Amendment barred the application of compulsory school attendance law to Old Order Amish who did not send their children to school after the eighth grade because "only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion."); *Sherbert v. Verner,* 374 U.S. 398, 403, 410, 83 S.Ct. 1790, 1793–94, 1797, 10 L.Ed.2d 965 (1963) (applying the compelling state interest test and holding that the disqualification of a Sabbatarian from receiving unemployment benefits because of her refusal to work on Saturdays violated the Free Exercise Clause); *see also Thomas v. Review Board, Indiana Employment Sec. Division,* 450 U.S. 707, 718, 101 S.Ct. 1425, 1432, 67 L.Ed.2d 624 (1981) ("The state may justify an inroad on religious liberty by showing that it is the least restrictive means of achieving some compelling state interest.").

In *Smith,* the Supreme Court rejected this compelling state interest test for facially neutral laws of general applicability that only incidentally burden the free exercise of religion. 494 U.S. at 883–85, 110 S.Ct. at 1602–04. In *Smith,* the Supreme Court held that the Free Exercise Clause of the First Amendment did not forbid the state of Oregon from either banning sacramental peyote use by Native Americans through its general criminal prohibition of ingestion of the drug or denying unemployment benefits to persons terminated from their jobs for such religiously inspired peyote use. *Id.* at 890, 110 S.Ct. at 1606; *see also Church of the Lukumi Babalu Aye, Inc.,* — U.S. —, ——, 113 S.Ct. 2217, 2226, 124 L.Ed.2d 472 (1993) ("[O]ur cases establish the general proposition that a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice.") (citation omitted).

---

**3.** The plaintiff's Eighth Amendment claim is brought pursuant to 42 U.S.C. § 1983.

**4.** The defendants do not challenge the constitutionality of RFRA.

Congress responded to *Smith* by passing RFRA. *See* 42 U.S.C. § 2000bb. RFRA's purpose is to "restore the compelling interest test as set forth in *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) and *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) and to guarantee its application in all cases where free exercise is substantially burdened...." 42 U.S.C. § 2000bb–1(b)(1).

RFRA makes clear both the strict standard under which free exercise cases should be evaluated and the government's burden of proof. It provides, in pertinent part:

(a) In general

Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.

(b) Exception

Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000bb–1. The statute specifies that "demonstrates" means meets the burdens both of production and of persuasion. 42 U.S.C. § 2000bb–2(3).

■ A plaintiff asserting a claim under RFRA must make a threshold showing that the plaintiff's religious exercise has been substantially burdened before requiring the government to meet its burdens of production and persuasion with respect to proving a compelling governmental interest and the use of the least restrictive means. *See, e.g., Davidson v. Davis,* No. 92 Civ. 4040, 1995 WL 60732, *5 (S.D.N.Y. Feb. 14, 1995); *Bes-*

*sard v. California Community Colleges,* 867 F.Supp. 1454, 1462 (E.D.Cal.1994); *Boone v. Commissioner of Prisons,* No. Civ. A. 93–5074, 1994 WL 383590, *7 (E.D.Pa. July 21, 1994), *aff'd,* No. 94–1788, 60 F.3d 814 (3d Cir. May 25, 1995). "To establish such a substantial burden, the plaintiff must demonstrate that the government's action pressures him to commit an act forbidden by his religion or prevents him from engaging in conduct or having a religious experience mandated by his faith." *Davidson,* 1995 WL 60732 at *5 (citations omitted).

Even prior to *Smith,* the Supreme Court treated free exercise claims by prison inmates differently from other free exercise claims because while "convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison[,]" *Bell v. Wolfish,* 441 U.S. 520, 545, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979), "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Price v. Johnston,* 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948). Rather than apply a compelling state interest test to prison regulations that burdened inmates' rights to the free exercise of religion, the Supreme Court applied the "reasonableness" test of *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), and *O'Lone v. Shabazz,* 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) ("*Turner/O'Lone* standard" or "*Turner/O'Lone* reasonableness test"). In *O'Lone,* the Supreme Court explained that in scrutinizing a prison regulation that burdens a prison inmate's free exercise right, the regulation need only be "reasonably related to legitimate penological interests." *Id.* at 349, 107 S.Ct. at 2404 (citing *Turner,* 482 U.S. at 89, 107 S.Ct. at 2261–62).[5]

---

**5.** In *O'Lone,* the Court explained that this lower level of scrutiny gives due deference to prison administrators. *O'Lone,* 482 U.S. at 349, 353, 107 S.Ct. at 2404–05, 2406–07. Applying this test, the Court upheld the refusal to allow certain inmates to attend religious services on Friday afternoons held in certain buildings of the prison, concluding that such refusal was reasonable in light of the penological concerns for institu-

tional order, security and rehabilitation. *Id.* at 353, 107 S.Ct. at 2406–07.

In *O'Lone,* the Court adopted the analysis previously set forth in *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), for evaluating prison regulations. In *Turner,* the Supreme Court upheld a regulation limiting inmate-to-inmate correspondence and struck a reg-

Both the House and the Senate Reports explain that RFRA's compelling state interest test applies to free exercise claims by prison inmates. *See* S.Rep. No. 111, 103d Cong., 1st Sess. (1993), *reprinted in* 1993 U.S.C.C.A.N. 1892 ("Senate Report"); H.R.Rep. No. 88, 103d Cong., 1st Sess. (1993), 1993 WL 158058 ("House Report"). The legislative history indicates that RFRA was intended to restore the "traditional" compelling state interest test in the prison context that was "weakened" by *O'Lone.* Senate Report at 9, 1993 U.S.C.C.A.N. at 1898–99.[6] However, the Senate Report also explains that while RFRA establishes one test for all claims of government infringement on religious practices, "[t]his single test ... should be interpreted with regard to the relevant circumstances in each case." Senate Report at 9, 1993 U.S.C.C.A.N. at 1898. Accordingly, "the committee expects that the courts will continue the tradition of giving due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." Senate Report at 10, 1993 U.S.C.C.A.N. at 1900. However, "the state must do more than simply offer conclusory statements that a limitation on religious freedom is required for security, health of [sic] safety" to establish that its interests are of the "highest order." Senate Report at 10, 1993 U.S.C.C.A.N. at 1899 (internal quotations and citation omitted).[7]

■ The defendants argue that, under RFRA, the plaintiff has not met his initial burden of showing that his right to the free exercise of religion has been substantially burdened. The defendants have not argued

---

ulation restricting inmate marriages. *Id.* at 81, 107 S.Ct. at 2257–58. The Court in *Turner* held that regulations that impinge on prison inmates' constitutional rights are valid if they are "reasonably related to legitimate penological interests." *Id.* at 89, 107 S.Ct. at 2261. The Court explained that the relevant factors in determining the reasonableness of a regulation are: first, whether there is a valid and rational connection between the prison regulation and the legitimate governmental interest asserted; second, whether there are alternative means of exercising the right to religious freedom left open to inmates; third, the impact that accommodation of the asserted constitutional right will have on guards and other inmates and on the allocation of prison resources generally; and fourth, the absence of ready alternatives. *Id.* at 89–91, 107 S.Ct. at 2261–63; *see also Benjamin v. Coughlin*, 905 F.2d 571, 576–77 (2d Cir.) (applying the *Turner/O'Lone* standard in holding that tying the plaintiff inmate's hair back represented a suitable alternative to a prison directive requiring an initial haircut upon admission to a correctional institution for purposes of an identification photograph), *cert. denied*, 498 U.S. 951, 111 S.Ct. 372, 112 L.Ed.2d 335 (1990).

6. The Court of Appeals for the Second Circuit recently recognized that *O'Lone* was "superseded" by RFRA. *See Giano v. Senkowski*, 54 F.3d 1050, 1053 (2d Cir.1995).

7. In his dissent in *Giano v. Senkowski*, 54 F.3d 1050 (2d Cir.1995), Judge Calabresi explained that even with respect to the deference afforded to prison administrators under the reasonableness test applied to First Amendment claims by inmates:

[O]nce the strictness of our review has been lessened—out of proper respect for the informed judgments of officials who are respon-

sible for prison safety and discipline—to a standard of 'reasonableness,' we must be especially careful not to permit additional incantations of 'deference' to lead us automatically to accept unsubstantiated assertions that a prison regulation is 'reasonable.' As Justice Blackmun warned in *Block v. Rutherford*, 468 U.S. 576, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984), courts must not let 'the rhetoric of judicial deference [substitute] for meaningful scrutiny of constitutional claims in the prison setting.' *Id.* at 592–94, 104 S.Ct. at 3235–36 (Blackmun, J., concurring in the judgment). For 'deference to the administrative expertise and discretionary authority of correctional officials must be schooled, not absolute,' *Campbell v. Miller*, 787 F.2d 217, 227 n. 17 (7th Cir.), *cert. denied*, 479 U.S. 1019, 107 S.Ct. 673, 93 L.Ed.2d 724 (1986), and 'carte blanche deference [is] improper.' *Thornburgh [v. Abbott]*, 490 U.S. [401] at 422 [109 S.Ct. 1874] at 1886 [104 L.Ed.2d 459 (1989)] (Stevens, J., concurring in part and dissenting in part) (explaining the Supreme Court's holding).

*Id.* at 1058 (Calabresi, J., dissenting).

The plaintiff's motion for a preliminary injunction in this case requires the Court to evaluate the plaintiff's likelihood of success under RFRA and does not involve the plaintiff's First Amendment claim; therefore, the test applicable to the plaintiff's claim is different from that applied in *Giano* which involved a free speech claim under the First Amendment. Significantly, the Court of Appeals in *Giano* carefully noted that the free exercise cases it cited had been superseded by RFRA. *See id.* at 1053.

that the plaintiff's religious beliefs are not sincere; indeed, given the plaintiff's decision to endure the conditions of medical keeplock for over three and a half years based on what he claims are the tenets of his religion, it would be difficult to make such an argument. Instead, the defendants argue that submitting to the PPD test would not violate the plaintiff's religious beliefs because PPD is a "naturally-derived organic protein." (Defs.' Mem.Opp'n Mot. at 12.) However, as the Court of Appeals explained in *Patrick v. LeFevre*, 745 F.2d 153 (2d Cir.1984):

> It cannot be gainsaid that the judiciary is singularly ill-equipped to sit in judgment on the verity of an adherent's religious beliefs. Mindful of this profound limitation, our competence properly extends to determining 'whether the beliefs professed by a [claimant] are sincerely held and whether they are, in his own scheme of things, religious.'

*Id.* at 157 (citing *United States v. Seeger*, 380 U.S. 163, 185, 85 S.Ct. 850, 863–64, 13 L.Ed.2d 733 (1965)); *see also Campos v. Coughlin*, 854 F.Supp. 194, 210 n. 13 (S.D.N.Y.1994) (Sotomayor, J.) ("Prohibiting adherents from practicing what they genuinely believe to be an integral part of their religion can only be a burden."). The plaintiff's steadfast adherence to his claim that submitting to the PPD test would violate the tenets of his religion, despite his continued confinement in medical keeplock, establishes that his right to the free exercise of religion has been substantially burdened.

■ The plaintiff asserts that the way the mandatory screening policy has been applied to him violates both aspects of the RFRA test. He argues that the defendants have not shown that keeping him in medical keeplock furthers a compelling interest and that the defendants have not used the least restrictive means of advancing a compelling interest. (Pl.'s Mem.Supp.Mot. at 11, 13.) The defendants, on the other hand, assert that compelling private and public health interests underlie the Program. They argue that they have a compelling interest in protecting the DOCS staff and inmates from TB, a deadly disease that has posed a serious threat in prisons over the last several years.

(Defs.' Mem.Opp'n Mot. at 14.) And, the defendants argue that they need complete data, derived from universal PPD testing, in order to achieve an effective disease control program because it permits DOCS to track the spread of the disease, to monitor the efficacy of the control program and to identify those at greater risk of developing active TB and candidates for preventive therapy. (Defs.' Mem.Opp'n Mot. at 16.)

The defendants also argue that because the PPD test is the only medically accepted method of screening for TB infection, and because such screening is necessary for epidemiological purposes, the policy of medically keeplocking inmates who refuse to take the test is the least restrictive means to advance their compelling interests. (*Id.*) They assert that if screening were "not mandatory and universal," the effectiveness of the Program would be undermined to the detriment of private and public health interests. (*Id.*) Finally, the defendants argue that failing to "take strong action" and permitting those who refuse to take the test to return to the general population could implicate the order and security of the facility because of "the fear generated by a highly contagious, potentially fatal disease...." (*Id.*)

The plaintiff does not dispute that the defendants have a compelling interest in protecting inmates and DOCS staff from tuberculosis. (Pl.'s Reply Mem.Supp.Mot. at 5.) However, under RFRA, the defendants must do more than invoke the talismanic justifications of health and safety to overcome a free exercise claim. *See Campos*, 854 F.Supp. at 207 ("[D]efendants cannot merely brandish the words 'security' and 'safety' and expect that their actions will automatically be deemed constitutionally permissible conduct."). Specifically, they must demonstrate that their actions further a compelling interest and that they have used the least restrictive means. At trial, it is very likely that the plaintiff will establish that the facts of this case demonstrate that the way the defendants have enforced their mandatory screening policy with respect to him does absolutely nothing to advance a compelling interest, failing both prongs of the RFRA test.

The plaintiff has demonstrated, after three and a half years, that he is unlikely to take the PPD test. Therefore, the only thing that the defendants are accomplishing by confining the plaintiff in medical keeplock is the continued imposition on the plaintiff of severely restrictive conditions. The defendants are not even obtaining the information they seek. Moreover, the defendants' failure to obtain this information from this inmate does not, in any significant way, detract from the TB Control Program given both the admitted imprecision of the information because of the error rates for the test and the alternative ways of observing and testing the plaintiff to assure that he is not, in any way, a threat to anyone else in the correctional facility. An analysis of the specific reasons proffered by the defendants for continuing medical keeplock demonstrates that they are not sufficient and are, in fact, the kind of talismanic incantations that do not suffice to burden sincere assertions of religious freedom.

The defendants have conceded that the plaintiff is not contagious and that, therefore, he is not being kept in medical keeplock to prevent others from being exposed to him. Accordingly, the plaintiff has not been kept in respiratory confinement and he is not kept from contact with DOCS staff and other inmates when he is taken out of his cell for his weekly shower and for legal visits. *Cf. Smallwood–El v. Coughlin,* 589 F.Supp. 692, 699–700 (S.D.N.Y.1984) (Pollack, J.) (no violation of an inmate's First Amendment rights where he was quarantined until he submitted to medical procedures that ensured that he did not have a contagious venereal disease). Indeed, inmates who pose a demonstrably greater risk to others are not placed in medical keeplock; for example, inmates who have tested positive to the PPD test and who have refused preventive INH therapy are permitted to live among the general prison population if they do not display symptoms of the active disease. It is useful to recall that the plaintiff also has not displayed any symptoms of the active disease. The defendants argue that it is justified to allow these inmates to return to the general population because their submission to the PPD test has advanced both public and private health interests—their submission to the PPD test has

advanced the public interest of providing information that is used to track the spread of the disease, and it has advanced the private interest of identifying inmates who test positive who then can be monitored and encouraged to undergo preventive therapy. (Defs.' Mot.Opp'n Mot. at 17.) However, the defendants cannot credibly argue that continuing the plaintiff's confinement in medical keeplock forever advances an interest since they are not obtaining any information from the plaintiff and they can monitor the plaintiff if he is released.

While the defendants argue that keeping the plaintiff in medical keeplock advances their interest in collecting information because it will convince the plaintiff to submit to the PPD test, the plaintiff's choice to remain in medical keeplock for over three and a half years to honor his asserted religious beliefs indicates that this is just not so. There is no basis to believe that continued confinement will cause the plaintiff to give up his asserted religious beliefs and take the PPD test. There comes a point, even with civil contempt, when it is apparent that confinement is no longer appropriate because it is no longer calculated to produce compliance with a court's order. *See, e.g., Simkin v. United States,* 715 F.2d 34, 37 (2d Cir.1983) ("When a recalcitrant witness is jailed for refusing to furnish unprivileged information in state court proceedings, it has been held that at some point in what otherwise would be an indefinite period of confinement due process considerations oblige a court to release a contemnor from civil contempt if the contemnor has then shown that there is no substantial likelihood that continued confinement will accomplish its coercive purpose.").

Moreover, given the high margin of error from the PPD test, it is highly questionable whether this individual plaintiff's submitting to the test furthers the defendants' interest in obtaining medically significant information. The PPD test reports approximately two percent false positives and up to ten percent false negatives; therefore, the plaintiff's refusal to submit to the test cannot threaten the integrity of the entire Program as the defendants assert. In the face of the admitted inaccuracy of the test and the plain-

tiff's objection to the test on religious grounds, the defendants are hard-pressed to argue that forcing this one inmate to submit to this test furthers their interest in collecting significant information for epidemiological purposes.

■ The defendants nevertheless argue that it "could cause concern and possible unrest" among inmates and staff if DOCS fails to take "strong, effective measures" to control TB, including not permitting those whose TB status is unknown to remain in the general population. (Strack Aff. of 3/16/95 at ¶ 4.) However, the defendants have not demonstrated that such a reaction is at all likely. The plaintiff has not been kept in respiratory confinement at any point since he refused to take the PPD test over three and a half years ago and the inmates who test positive but who do not have symptoms of tuberculosis are permitted to live among the general population. The defendants have offered no evidence that either situation has caused any incidents. It would be incredible if inmates who tested positive on the PPD test could be returned to the general population, but an inmate whose TB status was unknown could not because the latter would cause disruption. It is useful to recall again that the plaintiff has not shown any symptoms of active tuberculosis.

The defendants also argue that releasing the plaintiff from medical keeplock could cause an onslaught of religious objections to the PPD test. However, the evidence presented does not demonstrate that a concern about a "slippery slope" is at all justified. In fact, the defendants were able to identify only one other litigation in which a plaintiff challenged the PPD test on religious grounds. (Exh. A to Hathaway Aff. of 4/7/95.) In addition, the statistics that the defendants submitted to the Court indicate that, as of January 19, 1995, sixteen inmates had refused to take the PPD test on any basis. (Exh. D to Hathaway Aff. of 4/7/95.) Finally, the defendants were able to locate only a few letters from inmates requesting that they be exempted from the test on religious grounds. (Exh. C to Hathaway Aff. of 4/7/95.) To suggest that the totality of this evidence demonstrates that the defen-

dants' interests in health will be compromised by their releasing this plaintiff from medical keeplock after over three and a half years, given the plaintiff's asserted religious objection, is not tenable.

■ Moreover, the defendants also have failed to demonstrate that continuing to keep the plaintiff in medical keeplock is the least restrictive means of furthering their asserted compelling interest. The plaintiff has suggested an alternative way that he might be treated that would not compromise the defendants' health interests and that would accommodate his asserted religious objection to the PPD test. Specifically, he has suggested that he be treated in the same way as inmates who both test positive on the PPD test and refuse therapy are treated; these inmates are permitted to remain in the general population because they do not have active tuberculosis. The defendants could give the plaintiff periodic chest x-rays and check him for clinical symptoms of tuberculosis. And, the plaintiff could provide a sputum sample which would demonstrate conclusively whether he has active tuberculosis. (*See* Greifinger Depo. at 31.) While the defendants argue that it would not be feasible or reasonable to force them to "divert" prison resources to monitor the plaintiff in the way they monitor inmates who have tested positive, (Defs.' Mem.Opp'n Mot. at 19), and that a chest x-ray would not serve their interest in acquiring information, (*id.* at 17), such an accommodation of a sincere free exercise claim maintained for over three and a half years represents a less restrictive alternative by which the defendants can advance their interests in health; therefore, the defendants are required to use this alternative under RFRA.

The facts of this case demonstrate that, at this point, continuing to keep the plaintiff in medical keeplock is not furthering a compelling governmental interest, a nexus which is required under RFRA to justify the defendants' actions. The plaintiff, in choosing to undergo the conditions of medical keeplock for a period of over three and a half years, has shown remarkable conviction for what he has stated are his religious beliefs. The record does not permit any reasonable inference that the plaintiff's continued confine-

ment in medical keeplock will have any effect on his adamant refusal to submit to the PPD test; and, it is clear that the plaintiff's confinement is not producing any information for the defendants. Moreover, it is apparent that so long as the plaintiff refuses to submit to the test, no compelling governmental interest is being furthered.

The specific facts and circumstances of this case demonstrate the plaintiff's strong likelihood of success on his RFRA claim, justifying a preliminary injunction.[8]

## V.

■ The Eighth Amendment prohibits the infliction of "cruel and unusual punishments" on those convicted of crimes. U.S. Const. amend. VIII; *see also Robinson v. California,* 370 U.S. 660, 666, 82 S.Ct. 1417, 1420, 8 L.Ed.2d 758 (1962) (the Eighth Amendment applies to the states through the Due Process Clause of the Fourteenth Amendment); *Rhodes v. Chapman,* 452 U.S. 337, 345, 101 S.Ct. 2392, 2398–99, 69 L.Ed.2d 59 (1981) ("It is unquestioned that '[c]onfinement in a prison ... is a form of punishment subject to scrutiny under the Eighth Amendment standards.' ") (quoting *Hutto v. Finney,* 437 U.S. 678, 685, 98 S.Ct. 2565, 2571, 57 L.Ed.2d 522 (1978)). To establish that conditions of confinement constitute cruel and usual punishment, a plaintiff must prove both (1)

a sufficiently serious deprivation and (2) that the defendants acted with "deliberate indifference." *Wilson v. Seiter,* 501 U.S. 294, 298, 303–04, 111 S.Ct. 2321, 2323–24, 2326–27, 115 L.Ed.2d 271 (1991).[9] Thus, the plaintiff's proof consists of both objective and subjective elements—the plaintiff must demonstrate that the alleged deprivation is sufficiently serious under an objective standard and that the charged officials acted with a sufficiently culpable state of mind. *See Hudson v. McMillian,* 503 U.S. 1, 8, 112 S.Ct. 995, 999–1000, 117 L.Ed.2d 156 (1992); *Koehl v. Dalsheim,* No. 94 Civ. 3351, 1995 WL 331905, *3 (S.D.N.Y. June 5, 1995) (Martin, J.).

The appropriate inquiry with respect to the plaintiff's Eighth Amendment claim is not, as the defendants argue, whether the TB Control Program, with its mandatory screening, violates the Eighth Amendment. Rather, the issue is whether keeping the plaintiff in medical keeplock for so long as he chooses to adhere to his stated religious beliefs, after the plaintiff has demonstrated that it is most likely that he will continue to resist taking the test forever, amounts to cruel and unusual punishment. Given the facts and circumstances of this case, it is very likely that the plaintiff will succeed on this claim as well.

■ With respect to the first prong of the *Wilson* inquiry, it is clear that the plain-

---

**8.** The cases on which the defendants rely are not dispositive because they do not involve a claim under RFRA or a similar factual record to that developed in this case. Certainly, none of them involve prison officials seeking to continue to subject an inmate to such restrictive conditions of confinement after three and a half years in the hope that the inmate will take a screening test. *See, e.g., Johnson v. Keane,* No. 92 Civ. 4287, 1994 WL 37790, *1–2 (S.D.N.Y. Feb. 9, 1994) (Leisure, J.) (inmate submitted to PPD test within one week who raised no RFRA or First Amendment free exercise claim); *Payne v. Coughlin,* 93 Civ. 3378, Report and Recommendation, slip op. at p. 7–8 (S.D.N.Y. Oct. 12, 1994) (Grubin, M.J.) (inmate who was confined for less than two years raised a First Amendment claim which was assessed under the *Turner* test); *see also Dunn v. White,* 880 F.2d 1188, 1197–98 (10th Cir.1989) (mandatory AIDS test did not violate inmate's First Amendment rights where the inmate did not plead sufficient facts to show his religious grounds for objecting to the test), *cert. denied,* 493 U.S. 1059, 110 S.Ct. 871, 107 L.Ed.2d 954 (1990); *Ballard v. Woodard,* 641 F.Supp. 432, 437 (W.D.N.C.1986) (pre-RFRA First Amend-

ment challenge by an inmate who was physically forced to submit to a tuberculosis test).

**9.** The plaintiff contends that "he need not prove 'deliberate indifference' because he is challenging the excessiveness and disproportionality of a specific punishment meted out by the State to all persons who violate a certain state law...." (Letter from Mitchell A. Karlan dated 4/7/95.) He acknowledges, however, that if the Court treats the plaintiff's claim as one challenging the conditions of confinement, the plaintiff must prove deliberate indifference. (*Id.*)

The plaintiff's claim properly is characterized as one challenging the conditions of confinement, requiring him to meet the two-part test of *Wilson. See, e.g., Young v. Scully,* Nos. 91 Civ. 4332, 91 Civ. 4801, 91 Civ. 6768, 91 Civ. 6769, 1993 WL 88144, *4 (S.D.N.Y. March 22, 1993) (Martin, J.) (a plaintiff asserting an Eighth Amendment claim based on a post-sentencing deprivation must prove a sufficiently serious deprivation and that the defendants acted with the requisite intent).

tiff's indefinite confinement in medical keep-lock deprives him of all meaningful opportunity for exercise. *See, e.g., Rhem v. Malcolm,* 371 F.Supp. 594, 627 (S.D.N.Y.) (Lasker, J.) (fifty minute per week opportunity for exercise held to violate the Eighth Amendment), *supplemented,* 377 F.Supp. 995 (S.D.N.Y.), *aff'd in part and remanded in part on other grounds,* 507 F.2d 333 (2d Cir.1974); *Frazier v. Ward,* 426 F.Supp. 1354, 1369 (N.D.N.Y.1977) (prolonged denial of one hour per day of exercise, at least five days a week, violated the Eighth Amendment); *cf. Anderson v. Coughlin,* 757 F.2d 33, 36 (2d Cir.1985) (one hour per day of outdoor exercise held constitutionally sufficient). As the Supreme Court has explained, the Eighth Amendment "does not mandate comfortable prisons," *Rhodes,* 452 U.S. at 349, 101 S.Ct. at 2400; it does, however, prohibit conditions of confinement that either result in "unquestioned and serious deprivation[s] of basic human needs" or "deprive inmates of the minimal civilized measure of life's necessities." *Id.* at 347, 101 S.Ct. at 2399; *accord Anderson,* 757 F.2d at 34–35. Under the cases concerning the need for sufficient exercise, the plaintiff can establish that the conditions of medical keeplock constitute a sufficiently serious deprivation to satisfy the first prong of the *Wilson* test.[10]

With respect to the second prong of the *Wilson* test, the Supreme Court discussed what constitutes "deliberate indifference" in the context of Eighth Amendment challenges to conditions of confinement in *Farmer v. Brennan,* —— U.S. ——, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). The Court held:

> We hold ... that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Id.* at ——, 114 S.Ct. at 1979.

The defendants argue that the plaintiff cannot establish deliberate indifference because the TB Control Program, including the mandatory screening, "is not intended to

---

**10.** The defendants argue that the exercise cases are inapposite because the plaintiff, in effect, "holds the keys to his cell." (Defs.' Mem.Opp'n Mot. at 22.) According to the defendants, the deprivations attendant to medical keeplock, including the lack of opportunity for exercise, do not amount to cruel and unusual punishment because they are, in a sense, optional. In support of this proposition, they rely most heavily on the Court of Appeals' decision in *Sostre v. McGinnis,* 442 F.2d 178 (2d Cir.1971), *cert. denied,* 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 (1972), *cert. denied,* 405 U.S. 978, 92 S.Ct. 1190, 31 L.Ed.2d 254 (1972).

In *Sostre,* the plaintiff was placed in punitive segregation for alleged violations of various prison rules. *Id.* 183–84. Inmates placed in punitive segregation were confined to their cells at all times except for a brief period each week to shave and shower. *Id.* at 186. Moreover, they were permitted one hour of outdoor exercise per day provided that they submitted to a strip search. *Id.* The plaintiff refused to submit to the strip search and thus was denied the exercise. *Id.* In holding that the conditions of punitive confinement did not violate the Eighth Amendment, the court considered, among other things, the plaintiff's opportunity for exercise. *Id.* at 193–94.

The facts of the present case, however, are different from those of *Sostre.* Here, the plaintiff has the opportunity to exercise only if he is willing to compromise what he has asserted to be his sincerely held religious beliefs. The court's analysis of the conditions of confinement in *Sostre* was bound up with the fact that the conditions continued for more than one year because of the plaintiff's "intransigent defiance of several prison regulations, defiance which posed a credible threat to the security of the prison....." *Id.* at 194 n. 23. Here, the plaintiff has been kept in medical keeplock because he is asserting his religious beliefs; moreover, the plaintiff's release in the present case would not pose any credible threat to the security of anyone in the prison.

Even in the face of the court's limited opinion in *Sostre,* Judge Feinberg dissented on the issue of whether the plaintiff's segregation for more than one year constituted cruel and unusual punishment. He wrote:

> The majority opinion emphasizes that after all Sostre could have obtained release from isolation at any time by agreeing to abide by the rules and to cooperate.... The same observation could be made if Sostre were tortured until he so agreed, but no one would argue that torture is therefore permitted. The point is that the means used to exact submission must be constitutionally acceptable, and the threat of virtually endless isolation that endangers sanity is not.

*Id.* at 208 (Feinberg, J., dissenting in part and concurring in part).

wantonly inflict pain and suffering, but is intended to control a deadly disease and protect inmates and staff." (Defs.' Mem. Opp'n Mot. at 20.) The defendants are correct that there is authority to support the proposition that mandatory screening does not violate the Eighth Amendment.[11] But, the defendants' argument does not respond to the appropriate inquiry. Here, the plaintiff is being kept in conditions abhorrent to any rudimentary sense of humanity despite the ineffectiveness of such confinement in advancing any legitimate interest and despite the plaintiff's asserted religious objection. At this point, after over three and a half years of medical keeplock, it is apparent that the conditions of medical keeplock cause a substantial risk of harm to the plaintiff. As a result of the plaintiff's adherence to his asserted religious convictions, he claims, and the defendants do not dispute, that he has become unable to stand to go to the shower and that he suffers from soreness, rashes, headaches and hair loss. As discussed above, the conditions and the duration of confinement in this case have satisfied the first and objective prong of the *Wilson* test. And, the awareness of the defendants of the undisputed conditions and harm to the plaintiff supports the conclusion under *Farmer* that the defendants are deliberately indifferent to the harm caused to this inmate.[12] Under the circumstances of this case, it is

clear that the plaintiff is very likely to establish that keeping him in medical keeplock indefinitely, given the time that has elapsed and the physical ailments that he has suffered in order to abide by his asserted religious beliefs, constitutes deliberate indifference to the serious harm that is being imposed upon him.[13]

By letting the plaintiff out of medical keeplock, a preliminary injunction causes no harm. There is no dispute that the plaintiff is not contagious and that, therefore, he does not present a threat to the health of the inmates and staff of the facility. And, there is no dispute that the defendants do not obtain any information by keeping the plaintiff in medical keeplock. Instead, releasing the plaintiff from medical keeplock serves only to relieve the plaintiff of the continued imposition of extremely restrictive conditions, conditions that are continuing to cause him severe physical problems. At oral argument, counsel for the plaintiff, who has since been relieved, represented to the Court that the plaintiff has been treated more harshly than any other inmate in the New York state prison system, sick or healthy. The defendants have done nothing to contest that representation.

## VI.

As discussed herein, the plaintiff has demonstrated irreparable harm and a

---

11. *See, e.g., Johnson v. Keane,* 92 Civ. 4287, Report and Recommendation, slip op. at 13 (S.D.N.Y. April 30, 1993) (Buchwald, M.J.) (mandatory TB testing program did not involve deliberate indifference and did not violate the Eighth Amendment because it was adopted to protect inmates from harm), *adopted,* No. 92 Civ. 4287, 1994 WL 37790 (S.D.N.Y. Feb. 9, 1994) (Leisure, J.); *Zaire v. Dalsheim,* 698 F.Supp. 57, 59–60 (S.D.N.Y.1988) (Sprizzo, J.) (coercing an inmate to submit to a diphtheria-tetanus inoculation did not rise to the requisite level of "callous indifference" because it was administered "solely to protect plaintiff and other inmates from harm[ ]"), *aff'd,* 904 F.2d 33 (2d Cir.1990); *Ballard v. Woodard,* 641 F.Supp. 432, 438 (W.D.N.C. 1986) (administration of a TB test did not violate the Eighth Amendment); *see also Austin v. Penn. Dep't of Corrections,* Civ. A. No. 90–7497, 1992 WL 277511, *8 (E.D.Pa.1992) (ordering the implementation of a TB control program that required, among other things, mandatory screening).

12. *Farmer* makes it clear that prison officials do not have to act with the "very purpose of causing

harm...." — U.S. at ——, 114 S.Ct. at 1977; *see also Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) ("Deliberate indifference requires more than negligence, but less than conduct undertaken for the very purpose of causing harm.") (citing *Farmer,* — U.S. at ——, 114 S.Ct. at 1978), *cert. denied,* — U.S. ——, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995).

13. In *Sandin v. Conner,* — U.S. ——, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), the Supreme Court recently explained that while the states can create liberty interests that are protected by the Due Process Clause of the Fourteenth Amendment, such interests generally are limited to freedom from restraint that "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at ——, 115 S.Ct. at 2295. The Court's decision, however, did not affect inmates' rights under other constitutional provisions, including the First and Eighth Amendments. *See id.* at ——, 115 S.Ct. at 2302.

strong likelihood of success on the merits on both his RFRA and his Eighth Amendment claims; therefore, his motion for a preliminary injunction is granted.[14] Beginning on August 28, 1995, the defendants are enjoined during the pendency of this action from keeping the plaintiff in medical keeplock because of his failure to take the PPD test.

**SO ORDERED.**

14. The defendants have argued that the plaintiff's motion should be denied on several other bases, none of which justifies denying the preliminary injunction. First, they argue that the motion should be denied on grounds of laches. In order to establish a defense of laches, the defendants must prove two elements: (1) the plaintiff's lack of diligence and (2) prejudice to the defendants. *Kansas v. Colorado,* — U.S. —, —, 115 S.Ct. 1733, 1742, 131 L.Ed.2d 759 (1995); *see also Tri–Star Pictures, Inc. v. Leisure Time Prods., B.V.,* 17 F.3d 38, 44 (2d Cir.), *cert. denied,* — U.S. —, 115 S.Ct. 484, 130 L.Ed.2d 396 (1994); *King v. Innovation Books,* 976 F.2d 824, 832 (2d Cir.1992). The defendants have not satisfied either prong of this test. With respect to an alleged lack of diligence, the plaintiff was *pro se* until the law firm of Gibson, Dunn & Crutcher appeared on his behalf in the fall of 1994 for the sole purpose of arguing the constitutionality of RFRA, and then subsequently agreed to represent the plaintiff on October 31, 1994. (Pl.'s Reply Mem.Supp.Mot. at 12.) Given the fact that there had been no discovery up until that point, and that the plaintiff moved for a preliminary injunction shortly after deposing one of the defendants, there has been no undue delay. (Pl.'s Mem.Supp.Mot. at 12.) Moreover, the defendants have not established that there is any prejudice from the passage of time. Indeed, the defendants have continued to keep the plaintiff in medical keeplock throughout this period of time.

The defendants argue that laches bars the plaintiff's case even without their making a showing of prejudice, relying on *Plaza Health Labs., Inc. v. Perales,* 878 F.2d 577 (2d Cir.1989). While the Court of Appeals noted in that case that even if it had found merit in the plaintiff's arguments, it "would not automatically have reversed" the district court's decision to deny the plaintiff's motion for a preliminary injunction "given the leisurely pace at which [the plaintiff] ha[d] proceeded since the entry of that decision[,]" *id.* at 583, this statement does not eliminate the well-established two-prong test for laches, nor does it reasonably describe the plaintiff's actions in this case.

Second, the defendants have argued that a preliminary injunction would not be appropriate because the purpose of a preliminary injunction is to preserve the status quo and the plaintiff seeks to change the status quo. This argument is unfounded. In *Abdul Wali v. Coughlin,* 754 F.2d 1015 (2d Cir.1985), the Court of Appeals recognized that while typically, a preliminary injunction preserves the status quo, occasionally, a preliminary injunction will alter the positions of the parties and that, upon a sufficient showing, it is appropriate to grant such relief. *Id.* at 1025; *see also Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc.,* 60 F.3d 27, 33–35 (2d Cir.1995).

Third, the defendants, in passing, argue that the plaintiff's case is barred under the doctrine of collateral estoppel, or "issue preclusion," a doctrine which preludes the relitigation of issues identical to those raised and necessarily decided in a prior proceeding on a different claim. *See Cepeda v. Coughlin,* 785 F.Supp. 385, 388 (S.D.N.Y.1992) (Sweet, J.). "The party asserting issue preclusion bears the burden of showing that the identical issue was previously decided, while the party against whom the doctrine is asserted bears the burden of showing the absence of a full and fair opportunity to litigate in the prior proceeding." *Colon v. Coughlin,* 58 F.3d 865, 869–70 (2d Cir.1995) (citation omitted).

The defendants point to a prior Article 78 proceeding in state court. The defendants have not pressed this argument and the parties have not briefed the issue for purposes of the preliminary injunction motion; therefore, the issue is not properly presented on this motion as a reason to deny relief.

In any event, RFRA had not been enacted at the time of the plaintiff's Article 78 proceeding in December, 1992 and the factual circumstances of the plaintiff's confinement have changed since that time. Now, the plaintiff has been confined in medical keeplock for over three and a half years, a factual circumstance that is significant to the issues raised by this preliminary injunction motion. *See Haitian Centers Council, Inc. v. McNary,* 969 F.2d 1350, 1356 (2d Cir.1992) ("Even if all of the requirements for issue preclusion are met, a court should nonetheless decline to give collateral estoppel effect to a prior judgment if there are 'changes in facts essential to [the prior] judgment,' or if 'a new determination is warranted in order to take account of an intervening change in the applicable legal context or otherwise to avoid inequitable administration of the laws.') (citations omitted), *rev'd on other grounds sub nom. Sale v. Haitian Centers Council, Inc.,* — U.S. —, 113 S.Ct. 2549, 125 L.Ed.2d 128 (1993); *see also Valley Disposal, Inc. v. Central Vermont Solid Waste Management Dist.,* 31 F.3d 89, 102 (2d Cir.1994) (collateral estoppel does not apply where the circumstances have changed such that the plaintiff's claim was not adequately addressed in the prior proceeding).