**Paul JOLLY, Plaintiff–Appellee,**

v.

**Thomas COUGHLIN, Robert Greifinger, John P. Keane, C. Greiner, S. Kapoor, Defendants–Appellants.**

No. 922, Docket 95–2589.

United States Court of Appeals, Second Circuit.

Argued Oct. 27, 1995.

Decided Feb. 7, 1996.

---

Mitchell A. Karlan, New York City (Leslie E. Moore, Preetinder S. Bharara, Gibson, Dunn & Crutcher, New York City, of counsel), for plaintiff-appellee.

Barbara K. Hathaway, Assistant Attorney General of the State of New York (Dennis C. Vacco, Attorney General, Peter H. Schiff, Deputy Solicitor General, Daniel Smirlock, Assistant Attorney General, of counsel), for defendants-appellants.

Before: FEINBERG, OAKES, and CABRANES, Circuit Judges.

JOSÉ A. CABRANES, Circuit Judge:

The plaintiff, a Rastafarian inmate at Attica Correctional Facility, claims that his religious convictions do not permit him to submit to a screening test for "latent" tuberculosis mandated by the New York State Department of Correctional Services ("DOCS"). Under the tuberculosis ("TB") control policy in effect at the time of the district court's decision in this case, inmates who refused to submit to the test were placed in "medical keeplock"—*i.e.*, permitted to leave their cells only for one ten-minute shower per week. Medical keeplock is what the defendants term a form of administrative confinement with no actual medical significance. Thus, an inmate who refused to submit to the screening test for latent TB would continue to share the same breathing space as other inmates—that is, unlike inmates with "active" TB, he would not be placed in "respiratory isolation." In contrast, an inmate who took the screening test and was found to have latent TB would not be placed in either medical keeplock or respiratory isolation.

In December 1991, the plaintiff refused to submit to the test and was placed in medical keeplock indefinitely. He initiated this action *pro se* in 1992. In March 1995, with the assistance of counsel, he moved for a preliminary injunction, claiming that the defendants' treatment of him violated his right to the free exercise of religion under the Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. § 2000bb *et seq.*, and his right to be free from cruel and unusual punishment under the Eighth Amendment. The district court found that the plaintiff demonstrated a substantial likelihood of success on the merits of both of his claims and would suffer irreparable harm in the absence of an injunction. *Jolly v. Coughlin*, 894 F.Supp. 734 (S.D.N.Y.1995). We agree and therefore affirm.

## I. FACTS

The following facts are largely undisputed. In November 1991, the DOCS introduced a comprehensive TB control program, drawing upon protocols established by the New York State Department of Health and the Centers for Disease Control of the U.S. Public Health Service. Because of the potential for close and prolonged contact between a contagious individual and other inmates and staff, correctional facilities pose a particular risk for the transmission of TB. The DOCS guidelines therefore require each inmate to submit annually to a purified protein derivative ("PPD") test. The PPD test involves injecting a small amount of purified protein into the skin; a skin reaction signifies that the individual has been infected with the bacteria that causes tuberculosis. Once an individual is infected, he will likely carry the bacteria forever. He may, however, show no symptoms of the disease for some length of time;

such an individual is said to have "latent" tuberculosis, which is not contagious under normal circumstances. Without treatment, approximately eight percent of persons with latent TB will develop contagious, "active" TB.

Under the DOCS TB control policy, inmates with positive PPD tests are encouraged to undergo treatment, typically oral doses of a medication called Isoniazid ("INH"), to prevent the onset of active TB. Because INH can cause serious side effects, such as liver dysfunction, the therapy is not required. Whether or not they accept INH therapy, inmates with a positive PPD test are periodically given a chest x-ray to detect signs of active TB. In addition, physicians monitor inmates for the clinical symptoms suggestive of active TB, such as persistent coughing, fever, night sweats, and weight loss. The most effective way to detect active TB is through a culture of a patient's sputum.

Although DOCS screens for latent TB, inmates with a positive PPD test, whether or not they accept INH therapy, are not segregated from the general prison population, and therefore share the same breathing space with other prisoners. In contrast, the DOCS guidelines require that correctional officers confine inmates who refuse to take the PPD test to "medical keeplock." Prior to the district court's ruling in this case, any prisoner so confined would be permitted to take one ten-minute shower per week and could confer with legal counsel, but would otherwise remain in his regular cell at all times. An inmate in medical keeplock could not use the library, take communal meals, or engage in congregate worship. Medical keeplock does not involve "respiratory isolation"; thus, an individual who refused to submit to a PPD test would still share the same breathing space as other prisoners. Only an inmate with an abnormal chest x-ray, a positive sputum culture, or clinical symptoms suggestive of TB is segregated from the general prison population, and is placed in respiratory isolation.

The plaintiff has practiced the Rastafarian religion since March 1991. On December 10, 1991, he refused to submit to a PPD test, claiming that accepting artificial substances into the body is a sin under the tenets of Rastafarianism. In accordance with the DOCS guidelines, he was placed in medical keeplock.

Jolly filed this claim *pro se* in 1992. In addition, he initiated a state proceeding under Article 78 of the New York Civil Practice Law and Rules [1] seeking release from medical keeplock. The New York State Supreme Court, Westchester County, rejected his claim by a ruling entered December 22, 1992. The plaintiff spent one week in the general prison population at the Wende Correctional Facility in May 1994. Otherwise, in the three-and-a-half years between his refusal to submit to the PPD test and the entry of the district court's injunction, the plaintiff remained in medical keeplock except for weekly ten-minute showers. Jolly claims that the conditions of his confinement have led him to suffer from headaches, hair loss, rashes, and an inability to stand or walk without difficulty.

Jolly obtained counsel in this proceeding in late 1994. On March 8, 1995, the plaintiff filed an amended complaint and moved for a temporary restraining order and preliminary injunction to compel the defendants to release him from medical keeplock during the pendency of this lawsuit. The complaint alleged that the defendants violated the plaintiff's rights to the free exercise of religion under the Religious Freedom Restoration Act and the plaintiff's right to be free from cruel and unusual punishment under the Eighth Amendment.[2] The district court heard oral argument on the plaintiff's motion for a preliminary injunction on April 5, 1995.

---

1. Article 78, which supplanted the common law writs of certiorari, mandamus, and prohibition under New York law, permits judicial review of actions by state and local agencies and officers. *See* N.Y.C.P.L.R. §§ 7801–7806 (McKinney 1994).

2. The plaintiff's complaint also alleged violations of the Free Exercise Clause of the First Amendment, the Due Process Clause of the Fourteenth Amendment, and state constitutional and statutory provisions. The plaintiff moved for preliminary relief only on the RFRA and Eighth Amendment counts.

By an Opinion and Order dated August 14, 1995, the district court granted a preliminary injunction requiring the defendants to release the plaintiff from medical keeplock by August 28. *Jolly*, 894 F.Supp. at 749. On August 28, the district court denied the defendants' motions for reargument and for a stay pending appeal. *Jolly v. Coughlin*, 907 F.Supp. 63 (S.D.N.Y.1995). Nonetheless, the court stayed the injunction until September 1 to give the defendants an opportunity to decide whether to appeal and to seek from this Court a stay pending appeal. The district court's stay was subject to two conditions: that the defendants afford the plaintiff one hour of exercise per day and three showers per week. The district court's order also provided for the extension of the stay until September 8 should the defendants ultimately choose to file an appeal. On September 1, the defendants filed a notice of appeal and moved in this Court for a stay pending a decision on the appeal. We entered a temporary stay on September 6 and a full stay on September 12. We heard oral argument on October 27, 1995, and subsequently vacated the stay.

## II. DISCUSSION

We review the district court's grant of a preliminary injunction for abuse of discretion. *King v. Innovation Books*, 976 F.2d 824, 828 (2d Cir.1992). "Such an abuse of discretion ordinarily consists of either applying an incorrect legal standard or relying on a clearly erroneous finding of fact." *Id.* Finding neither defect in Judge Koeltl's comprehensive and thoughtful ruling in this case, we affirm.

### A. *Showing Required for a Preliminary Injunction*

The parties initially contest the showing Jolly is required to make to obtain preliminary injunctive relief. In most cases, a party seeking to obtain a preliminary injunction must establish that it will suffer irreparable harm in the absence of an injunction and demonstrate either (1) "a likelihood of success on the merits" or (2) "sufficiently serious questions going to the merits to make them a fair ground for litigation and a bal-

ance of the hardships tipping decidedly" in the movant's favor. *Waldman Publishing Corp. v. Landoll, Inc.*, 43 F.3d 775, 779–80 (2d Cir.1994) (quotation marks omitted); *Coca–Cola Co. v. Tropicana Prods., Inc.*, 690 F.2d 312, 314–15 (2d Cir.1982). Where a moving party challenges " 'government action taken in the public interest pursuant to a statutory or regulatory scheme,' " however, the moving party cannot resort to the "fair ground for litigation" standard, but is required to demonstrate irreparable harm and a likelihood of success on the merits. *Able v. United States*, 44 F.3d 128, 131 (2d Cir.1995) (per curiam) (quoting *Plaza Health Labs., Inc. v. Perales*, 878 F.2d 577, 580 (2d Cir. 1989)); *see Catanzano v. Dowling*, 60 F.3d 113, 117 (2d Cir.1995).

In some circumstances, an even higher standard applies. The moving party must make a "clear" or "substantial" showing of a likelihood of success where (1) the injunction sought "will alter, rather than maintain, the status quo"—*i.e.*, is properly characterized as a "mandatory" rather than "prohibitory" injunction; or (2) the injunction sought "will provide the movant with substantially all the relief sought, and that relief cannot be undone even if the defendant prevails at a trial on the merits." *Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 33–34 (2d Cir.1995).

Judge Koeltl first concluded that the plaintiff challenges government action taken in the public interest pursuant to a statutory or regulatory scheme. *Jolly*, 894 F.Supp. at 739. We agree. The plaintiff challenges a portion of a TB control policy—designed to protect the health of DOCS staff and inmates—that was adopted by the DOCS in consultation with public health officials and based on recommendations of the New York State Department of Health and the federal Centers for Disease Control. The plaintiff is therefore required to meet the heightened standard.

The district court next concluded that the plaintiff sought a prohibitory rather than mandatory injunction and was therefore not required to demonstrate a clear or substantial likelihood of success on the merits of his claims. We disagree. We recognize that

"[t]he distinction between mandatory and prohibitory injunctions is not without ambiguities or critics," *Tom Doherty Assocs.*, 60 F.3d at 34, and that in a close case an injunction can be framed in mandatory or prohibitory terms, *see id.; cf. International Union, United Mine Workers v. Bagwell,* ── U.S. ──, ──, 114 S.Ct. 2552, 2561, 129 L.Ed.2d 642 (1994). Indeed, such is the case here: The injunction could be viewed as mandating that the defendants release Jolly from medical keeplock during the pendency of this suit, or as prohibiting the defendants from continuing to confine Jolly to medical keeplock.

In concluding that the plaintiff here seeks a prohibitory rather than mandatory injunction, the district court relied primarily on our reasoning in *Abdul Wali v. Coughlin,* 754 F.2d 1015, 1025–26 (2d Cir.1985). *See Jolly,* 894 F.Supp. at 739, 749 n. 14. In *Abdul Wali,* several prisoners challenged a decision by the DOCS Commissioner not to permit the delivery to inmates of a published report discussing prison conditions. 754 F.2d at 1022. We characterized the injunction as prohibitory because it would merely have *prevented prison officials from interfering* with the normal delivery of the report from a third party to the prisoners. *Id.* at 1026. While the relief sought would, as a practical matter, alter the status quo, we noted that "[t]he distinction between mandatory and prohibitory injunctions ... cannot be drawn simply by reference to whether or not the status quo is to be maintained or upset." *Id.* at 1025 (italics omitted). That is particularly so when the parties to a given case may have different perspectives on what constitutes the status quo. *See Tom Doherty Assocs.,* 60 F.3d at 34.

We find this case sufficiently distinguishable from *Abdul Wali* to warrant our conclusion that the injunction sought should be characterized as mandatory. Jolly challenges a portion of a TB control program that has been in effect in New York state prisons for four years—and that was applied to him for more than three-and-a-half years. Because of the length of time that the plaintiff has been confined in medical keeplock, we do not view this case as one in which the status quo is difficult to identify or the difference in each party's perspective is relevant. The plaintiff was placed in medical keeplock in December 1991 and was to remain in keeplock indefinitely thereafter. An order mandating his release would require a dramatic shift in an established DOCS policy. Under the particular circumstances here presented, the status quo should not lightly be overturned.

Although the district court concluded that the plaintiff was not required to meet the more stringent "clear" or "substantial" standard, it found that the plaintiff had done so in any event. We agree. We evaluate in turn the district court's findings that the plaintiff demonstrated a substantial likelihood of success on his RFRA and Eighth Amendment claims and that the plaintiff would suffer irreparable harm in the absence of an injunction.

## B. *Substantial Likelihood of Success on the Merits*

### 1. *Religious Freedom Restoration Act Claim*

RFRA provides in pertinent part:

(a) In general

Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.

(b) Exception

Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000bb–1.

In enacting RFRA in 1993, Congress sought to restore the "compelling interest" test for defenses to claims that a facially neutral law of general applicability substantially burdens the free exercise of religion—a test that had been abandoned by the Su-

preme Court in *Employment Division, Department of Human Resources v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). The statute thus requires courts to apply the law as set forth in two earlier free exercise cases, *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), and *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). *See* 42 U.S.C. § 2000bb(b)(1).

■ Prior to the Supreme Court's decision in *Smith,* the Court had not applied the compelling interest standard to free exercise claims by prison inmates. *See O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349, 350, 107 S.Ct. 2400, 2404, 2405, 96 L.Ed.2d 282 (1987) (concluding that regulation burdening prison inmate's free exercise right need only be reasonably related to legitimate penological interests).[3] The statute itself, however, draws no distinction between claims by prison inmates and claims by others—indeed, the legislative history of RFRA makes clear that the compelling interest test is to apply to free exercise claims by prison inmates. *See* S.Rep.No. 111, 103d Cong., 1st Sess. 9 (1993), *reprinted in* 1993 U.S.C.C.A.N. 1892, 1899 (expressing intent "to restore the traditional protection afforded to prisoners to observe their religions[,] which was weakened by the decision in *O'Lone v. Estate of Shabazz* "); *see also* 139 Cong.Rec. S14,468 (daily ed. Oct. 27, 1993) (recording rejection of proposed Senate amendment to exempt inmates' claims from RFRA); 139 Cong.Rec. S14,361–62, S14,364 (daily ed. Oct. 26, 1993) (statement of Sen. Hatch) (opposing amendment to exempt inmates' claims) ("[A] long series of cases has recognized that prisoners are entitled to [free exercise] protection.... We seek only a well-reasoned balance of this fundamental right to practice one's religion against the significant responsibility of our prison administrators in the supervision of our prisons.... The imposition of the act's compelling State interest standard in prisoner free exercise cases strikes a sound and

reasonable balance between these competing interests.").[4] Thus, other circuits and district courts within this circuit have concluded that claims of prisoners fall within the broad language of RFRA. *See Hamilton v. Schriro,* 74 F.3d 1545, 1551 (8th Cir.1996); *Hicks v. Garner,* 69 F.3d 22, 25–26 (5th Cir.1995); *Werner v. McCotter,* 49 F.3d 1476, 1479 (10th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 2625, 132 L.Ed.2d 866 (1995); *Bryant v. Gomez,* 46 F.3d 948, 949 (9th Cir.1995) (per curiam); *Muhammad v. City of New York,* 904 F.Supp. 161, 187 (S.D.N.Y.1995); *Alameen v. Coughlin,* 892 F.Supp. 440, 447 (E.D.N.Y.1995); *Francis v. Keane,* 888 F.Supp. 568, 574–75 (S.D.N.Y.1995); *Campos v. Coughlin,* 854 F.Supp. 194, 205 (S.D.N.Y. 1994). While the *O'Lone* "reasonableness" test continues to have vitality for claims brought directly under the First Amendment—for the simple reason that a congressional enactment cannot modify the Supreme Court's constitutional interpretation—free exercise claims brought by prison inmates *under RFRA* are subject to the compelling interest test.

Even prior to *O'Lone,* courts accorded prison officials substantial deference in establishing appropriate regulations to maintain security and discipline within correctional facilities. *See, e.g., Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974) ("[C]hallenges to prison restrictions that are asserted to inhibit First Amendment interests must be analyzed in terms of the legitimate policies and goals of the corrections system...."); *Procunier v. Martinez,* 416 U.S. 396, 409–10, 412, 94 S.Ct. 1800, 1809, 1810, 40 L.Ed.2d 224 (1974) (noting that First Amendment guarantees must be applied in light of the special characteristics of the relevant environment; recognizing need to balance inmates' First Amendment rights against governmental interests in security and discipline), *overruled on other grounds by Thornburgh v. Abbott,* 490 U.S.

---

**3.** In *O'Lone,* the Court applied the "reasonableness" test developed in *Turner v. Safley,* a freedom of association case decided earlier in the same Term. 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987).

**4.** On July 28, 1995, Senator Reid, the sponsor of the original Senate amendment to exempt claims of inmates from RFRA's coverage, introduced a bill in the Senate that would have the same effect. S. 1093, 104th Cong., 1st Sess. (1995); *see* 141 Cong.Rec. S10,876, S10,895.

401, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989); *see also Block v. Rutherford,* 468 U.S. 576, 583–85, 104 S.Ct. 3227, 3231–32, 82 L.Ed.2d 438 (1984) (examining constitutional protections for pretrial detainees in light of deference to be accorded to judgment of correctional officials); *Bell v. Wolfish,* 441 U.S. 520, 547, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979) ("Prison administrators ... should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."). We must therefore conduct our inquiry in this case against the backdrop of prior decisions recognizing that courts are ill-equipped to substitute their judgments on matters of prison administration for those of prison authorities. *See* S.Rep.No. 111, at 9–10, 1993 U.S.C.C.A.N. at 1898–1900 ("[The compelling interest test] should be interpreted with regard to the relevant circumstances in each case.... [T]he committee expects that courts will continue the tradition of giving due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources."); *see also Hamilton,* 74 F.3d at 1552–53; *Werner,* 49 F.3d at 1479–80.

Mindful of these concerns, we conclude that Judge Koeltl properly found that the plaintiff had demonstrated a clear likelihood of success on the merits of his RFRA claim.

### a. *Substantial Burden*

■ As an initial matter, a plaintiff alleging a violation of RFRA must demonstrate that his right to the free exercise of religion has been substantially burdened. 42 U.S.C. § 2000bb–1(a). The plaintiff claims that, under the tenets of Rastafarianism, it is a sin to take artificial substances into the body. The defendants dispute what they contend is the plaintiff's "vague assertion" that the test would violate his religion, because the test involves the injection of a naturally derived protein rather than an artificial substance.

■ Like the district court, we reject this argument and find that the plaintiff has shown a substantial burden here. We have repeatedly recognized that the judiciary has but a "limited function ... in determining whether beliefs are to be accorded [free exercise] protection." *Patrick v. LeFevre,* 745 F.2d 153, 157 (2d Cir.1984); *see International Soc'y for Krishna Consciousness, Inc. v. Barber,* 650 F.2d 430, 439 (2d Cir.1981). Our scrutiny extends only to whether a claimant sincerely holds a particular belief and whether the belief is religious in nature. *Patrick,* 745 F.2d at 157. An inquiry any more intrusive would be inconsistent with our nation's fundamental commitment to individual religious freedom; thus, courts are not permitted to ask whether a particular belief is appropriate or true—however unusual or unfamiliar the belief may be. While it is a delicate task to evaluate religious *sincerity* without questioning religious *verity,* our free exercise doctrine is based upon the premise that courts are capable of distinguishing between these two questions. We must do so here. The defendants' claim that the PPD test does not burden the plaintiff's religious beliefs does not go to the sincerity or religious nature of the plaintiff's beliefs. Rather, the defendants seek to demonstrate that, as an objective matter, the plaintiff's belief is not accurate or logical—that the plaintiff has been in some way "misinformed." Appellants' Br. at 21. We have no competence to examine whether plaintiff's belief has objective validity. The defendants are, of course, free at a trial on the merits to challenge the sincerity or religious nature of the plaintiff's belief. Their present emphasis on the "natural" origin of the protein in the PPD test—in the face of the plaintiff's apparent conviction that it is *artificial* within the meaning of the Rastafarian faith—provides no basis for a conclusion that free exercise protection is unavailable to the plaintiff.

■ The district court concluded that "[t]he plaintiff's steadfast adherence to his claim that submitting to the PPD test would violate the tenets of his religion, despite his continued confinement in medical keeplock, establishes that his right to the free exercise of religion has been substantially burdened." *Jolly,* 894 F.Supp. at 743. We agree. None-

theless, we note that the district court need not have emphasized the extraordinary length of the plaintiff's confinement to medical keeplock as an indicator of a substantial burden. As cases decided prior to *Smith* make clear, a substantial burden exists where the state "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Thomas v. Review Bd. of the Indiana Employment Sec. Div.*, 450 U.S. 707, 718, 101 S.Ct. 1425, 1432, 67 L.Ed.2d 624 (1981); *see Sherbert*, 374 U.S. at 404, 83 S.Ct. at 1794 (finding substantial burden where individual is forced to "choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion . . . , on the other hand"); *see also Hicks*, 69 F.3d at 26 n. 22 (examining courts' treatment of substantial burden inquiry under RFRA). The choice here presented by the state— either submitting to the test or adhering to one's beliefs and enduring medical keeplock—itself constitutes a substantial burden. Thus, bearing in mind that the plaintiff is now before the court only for purposes of a preliminary injunction and must ultimately be put to his proof, we find that the plaintiff has made the required showing of a substantial burden—and indeed would have done so even if he had spent only a short period of time in keeplock or had been immediately coerced into taking the PPD test.

### b. *Compelling State Interest*

Once a plaintiff makes a threshold showing of a substantial burden on the right of free exercise, the government must demonstrate that the application of the burden to the individual furthers a compelling state interest and is the least restrictive means of furthering that interest. 42 U.S.C. § 2000bb–1(b). The district court concluded that the plaintiff had a high likelihood of establishing at trial that the defendants' enforcement of the mandatory TB screening policy with respect to the plaintiff "does absolutely nothing to advance a compelling interest, failing both prongs of the RFRA test." *Jolly*, 894 F.Supp. at 743.

The district court found that the state has a compelling interest in "protecting inmates and DOCS staff from tuberculosis." *Id.* Indeed, we have previously held that correctional officials have an affirmative obligation to protect inmates from infectious disease. *See Lareau v. Manson*, 651 F.2d 96, 109–11 (2d Cir.1981); *cf. DeGidio v. Pung*, 920 F.2d 525, 529–33 (8th Cir.1990) (affirming district court's conclusion that deficient TB control and treatment program violated Eighth Amendment). That conclusion does not, however, resolve our inquiry here. Although the interest in protecting against the spread of TB is compelling, it is clear that the plaintiff's continued confinement does not serve this interest. The defendants admit that the plaintiff does not have active TB and is therefore not contagious to other inmates and staff. The plaintiff is in *medical keeplock*, but he is not in *respiratory isolation*; he shares common breathing space with the general prison population. Moreover, numerous prisoners who have tested positive for latent TB and who refuse medication that might avoid the onset of active TB are not placed in respiratory isolation or medical keeplock. Thus, even if the plaintiff were to take the PPD test, test positive for latent TB, and refuse to take medication, he would be placed with the general prison population rather than in medical keeplock. On these facts, it seems clear that the defendants' isolation of the plaintiff does not and could not further the state's compelling interest in protecting inmates and DOCS staff from tuberculosis.

The defendants claim, however, that the district court ignored a broader compelling state interest *in administering an effective mandatory TB screening program.* Thus, the defendants suggest, the mandatory PPD test does not merely serve to protect inmates and staff from the spread of TB, but also permits DOCS to track whether and where TB is spreading and to evaluate the effectiveness of efforts to control TB. To exempt the plaintiff from the test, the defendants argue, would deprive DOCS of important information. If the plaintiff were permitted to remain in the general prison population without taking the PPD test, DOCS would discover that the plaintiff was infected only if and

478

when he developed the active form of the disease. Under those circumstances, DOCS would have no hope of identifying the source of the plaintiff's infection.

Contrary to the defendants' contentions, the district court did not suggest that there is no compelling state interest in administering an effective screening program. Indeed, Judge Koeltl determined that there was a compelling state interest, *Jolly*, 894 F.Supp. at 744, but concluded that keeping the plaintiff in medical keeplock would not serve this interest, for two primary reasons: (1) the PPD test itself has a "high margin of error," and "it is highly questionable whether this individual plaintiff's submitting to the test furthers the defendants' interest in obtaining medically significant information," *id.*; and (2) the fact that the plaintiff has chosen to remain in medical keeplock for more than three years suggests that the prison will not extract the necessary information from him at any point in the future, *id.*

We question the first conclusion. The record suggests that the PPD results in "false positives" (*i.e.*, a skin reaction when the individual is not infected with the bacteria that causes TB) in two percent of cases, and results in "false negatives" (*i.e.*, the absence of a skin reaction when the individual is infected with the bacteria that causes TB) in up to ten percent of cases. No basis appears in the current record for the conclusion that these rates are properly characterized as "high." This is particularly so in light of the fact that "false negatives" occur mainly in individuals with weakened immune systems, such as those inmates who are HIV-positive or who have developed AIDS. In an individual with a weakened immune system, the injection of protein involved in the TB test may not trigger a sufficient immune response to generate a skin reaction. Because there is no indication in the record that the plaintiff is one whose TB test is likely to lead to a false negative, we do not share the district court's skepticism that the defendants could not "ob-

tain[ ] medically significant information" from the plaintiff's submission to the test.

We find the district court's second conclusion more persuasive—and fully adequate to support the court's action in this case. In emphasizing DOCS's compelling interest in administering an effective TB screening program, the defendants obscure the fact that the plaintiff does not challenge the screening program itself, or indeed the policy of keeplocking for some length of time those who refuse on nonreligious grounds to submit to the test. Rather, the plaintiff challenges the decision to continue *his* confinement to medical keeplock. Under RFRA, the defendants bear the burden of demonstrating that the decision to continue *the plaintiff's* confinement to keeplock furthers a compelling state interest. *See* 42 U.S.C. § 2000bb–1(b) (requiring government to demonstrate that "application of the burden *to the person* ... is in furtherance of a compelling governmental interest") (emphasis supplied). Under the circumstances of this case, we agree with the district court that the plaintiff's decision to remain in medical keeplock for more than three-and-a-half years rather than submit to the TB test suggests that the prison will not ever extract the necessary information from him.[5]

The defendants suggest that releasing the plaintiff from medical keeplock—*i.e.*, exempting the plaintiff from mandatory testing on religious grounds—will undermine the DOCS mandatory testing program by encouraging others to object to the PPD test, presumably also on religious grounds. The plaintiff's confinement in medical keeplock is thus thought to serve some deterrent purpose. At this stage of the proceedings, however, there is simply no evidence that a religious exemption for the plaintiff would undermine the DOCS testing program. According to the defendants, when this appeal was argued, twenty-five of 60,000 inmates incarcerated in the various facilities administered by DOCS were refusing to submit to the TB test. There is no indication of how many of those

5. While we find the length of confinement to be irrelevant to our conclusion that the plaintiff has met the substantial burden requirement, *see supra* Section II.B.1.a, we hold that Jolly's endurance of three-and-a-half years in medical

keeplock is significant to our application of the compelling interest test. In so holding, we offer no opinion as to whether the mere threat of confinement to keeplock, or a shorter period of confinement, would satisfy the test.

individuals voiced religious objections to the TB test and how many had other grounds for objecting. At oral argument, counsel for the defendants suggested that the number of individuals refusing to submit to the test at the Green Haven Correctional Facility increased following the district court's ruling in this case. Again, there is no indication of how many of the inmates in question had religious objections to the test.

Similarly, the defendants raise certain safety concerns, claiming that other inmates will object to the plaintiff's presence in the general population in light of his refusal to submit to a TB test. The basis for any such objection is unclear, inasmuch as individuals who are *known* to carry the bacteria that causes tuberculosis are present in the general population as well. We agree with the district court that there is no basis in the current record to conclude that the plaintiff's exemption from the test on religious grounds will cause concern or unrest. *See Jolly,* 894 F.Supp. at 745.

Recognizing that we must give due deference to prison administrators on matters involving the health and safety of their inmates and staff, we nevertheless find that the defendants have offered no basis for concluding that the plaintiff's continued confinement to medical keeplock would serve the admittedly compelling state interests in administering an effective TB screening program or maintaining prison security. The DOCS policy is not insulated from scrutiny merely because the defendants brandish the concepts of public health and safety; as RFRA's legislative history suggests, the connection between the application of a policy to an individual and the furtherance of the government's goals must be clear. "[P]olicies grounded on mere speculation, exaggerated fears, or post-hoc rationalizations will not suffice to meet the act's requirements," even in the prison context. S.REP. 111, at 10, 1993 U.S.C.C.A.N. at 1900. The current record is simply devoid of evidence that allowing a religious exemption to the defendants' present policy would jeopardize the discovery of TB or result in a flood of prisoners refusing to take the TB test. The defendants will certainly have the oppor-

tunity to show otherwise at a trial on the merits.

#### c. *Least Restrictive Means*

 Even if we concluded that the plaintiff's continued confinement in medical keeplock did further a compelling state interest, that would not end the inquiry. The defendants must show that the plaintiff's medical keeplock status is the least restrictive means to further DOCS's asserted compelling interest. We agree with the district court that it is not the least restrictive means of doing so. *See Jolly,* 894 F.Supp. at 745.

To the extent that the government's interest is in protecting inmates and staff from tuberculosis, the defendants have not shown that the plaintiff's confinement is the least restrictive means of furthering that interest. Only *active* tuberculosis is contagious; the defendants' primary concern must therefore be to prevent the plaintiff from developing active tuberculosis and thereby becoming a source of contagion. By identifying inmates with latent tuberculosis, the PPD test serves to identify those inmates at risk of developing active tuberculosis. The plaintiff, by refusing to take the PPD test, *is also at risk of developing active tuberculosis,* because his TB status is unknown. The defendants could treat him as an inmate at risk—as though he had tested positive and refused to take preventive medication. The defendants could require his periodic submission to chest x-rays and sputum samples. The defendants suggest that such an approach would require a diversion of resources to monitor the plaintiff (and, presumably, other religious objectors). This accommodation represents a less restrictive alternative, and the defendants are therefore required to pursue it.

To the extent that the government's interest is broader—*i.e.,* administering an effective TB screening program—the conclusion remains the same. DOCS seeks to track the sources of contagion and monitor the effectiveness of its control program. As the defendants concede, the plaintiff would only be a source of contagion if he developed active tuberculosis; the placement of the plaintiff in the category of individuals who *could* pose a risk of transmission would seem to satisfy

the defendants' goals, since the defendants cannot identify with certainty *any* inmate as the source of the bacteria until the inmate develops active tuberculosis. On the record before us, there is no basis for concluding that treating the plaintiff and other religious objectors as though they could pose a risk of transmitting the TB bacteria would undermine the defendants' control program. Again, the defendants will have the opportunity to demonstrate otherwise at trial.

For the foregoing reasons, we conclude that the plaintiff has demonstrated a substantial likelihood of success on the merits of his RFRA claim. The district court properly entered a preliminary injunction on this basis.

### 2. *Eighth Amendment Claim*

■ To demonstrate that the conditions of his confinement constitute cruel and unusual punishment, the plaintiff must satisfy both an objective test and a subjective test. First, the plaintiff must demonstrate that the conditions of his confinement result "in unquestioned and serious deprivations of basic human needs." *Anderson v. Coughlin,* 757 F.2d 33, 35 (2d Cir.1985) (quotation marks omitted). Second, the plaintiff must demonstrate that the defendants imposed those conditions with "deliberate indifference." *Wilson v. Seiter,* 501 U.S. 294, 297, 111 S.Ct. 2321, 2323, 115 L.Ed.2d 271 (1991); *Whitley v. Albers,* 475 U.S. 312, 319–20, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986).

Judge Koeltl found that the plaintiff had demonstrated a substantial likelihood of success on the merits of his Eighth Amendment claim. We agree.

#### a. *Serious Deprivation*

■ In analyzing the objective prong of the prescribed inquiry, the district court found that the plaintiff's indefinite confinement to his cell but for one ten-minute shower per week would deprive him of "all meaningful opportunity for exercise." *Jolly,* 894 F.Supp. at 747. After the district court's ruling in this case, the defendants announced their intention to amend their policy to allow

prisoners confined in medical keeplock one hour of exercise per day and three ten-minute showers per week.[6] Regulations providing for similar periods of exercise have been found to satisfy this Court's test for the constitutionality of conditions of confinement. *See Anderson,* 757 F.2d at 36 (holding that one hour per day of outdoor exercise is constitutionally sufficient for Eighth Amendment purposes). While it is clear that the policy change would have no effect on the plaintiff's claim for damages, the question is whether, as the defendants contend, it renders inappropriate prospective relief on Eighth Amendment grounds.

Had the plaintiff all along been afforded meaningful daily exercise, or been deprived of all meaningful exercise for only a short period of time, we might face a more interesting constitutional question. As it happens, however, the plaintiff was for more than three-and-a-half years confined to his cell except for ten minutes per week—eight hours and forty minutes per year. We have no difficulty concluding that, on the heels of such extreme and prolonged confinement, to continue to confine the plaintiff to medical keeplock under somewhat improved conditions would run afoul of the Eighth Amendment.

The defendants contend that DOCS's original medical keeplock policy did not violate the Eighth Amendment because the plaintiff "held the keys to his cell"—i.e., would have been permitted exercise had he simply submitted to the PPD test. We disagree. The defendants rely mainly on our rejection of cruel and unusual punishment claims in *Sostre v. McGinnis,* 442 F.2d 178 (2d Cir.1971) (en banc), *cert. denied,* 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 (1972), and *Rivera v. Senkowski,* 62 F.3d 80 (2d Cir.1995). *Sostre* involved a prisoner who was permitted daily exercise, but who "refused [the] privilege" because he would not submit to a strip search as required under prison policy. 442 F.2d at 186. In *Rivera,* we observed that an inmate could avoid the curtailment of his privileges by agreeing to participate in prison programs, in which he had refused to participate because of his objection to his reclassifi-

---

**6.** The formal amendment of the policy apparently took place on October 11, 1995.

cation as a possible escape risk. 62 F.3d at 85. Thus, the defendants emphasize, our Eighth Amendment analysis in *Sostre* and *Rivera* considered the inmate's "choice" in the conditions of his confinement. Even if we were to overlook notable distinctions between the facts involved in those cases and the facts presented herein, we would find those cases to be of little relevance to our legal inquiry. It is enough simply to observe that the actions of the plaintiffs in *Sostre* and *Rivera* were not motivated by their sincere religious beliefs. Here, the defendants placed the plaintiff in the position of choosing to follow his religious beliefs or to improve his conditions of confinement; that choice is not meaningful, much less constitutional.

We therefore agree with the district court that the plaintiff has sufficiently shown at this stage of the proceedings that the conditions of his confinement constituted, for three-and-a-half years, a serious deprivation of basic human needs. We also conclude that the change in DOCS's policy does not make the plaintiff any less likely to succeed in demonstrating a serious deprivation after the implementation of the change. As the Supreme Court has noted, it is "plain" that "the length of confinement cannot be ignored in deciding whether the confinement meets [Eighth Amendment] standards." *Hutto v. Finney*, 437 U.S. 678, 686, 98 S.Ct. 2565, 2571, 57 L.Ed.2d 522 (1978); *cf. Sostre*, 442 F.2d at 207–09 (Feinberg, J., dissenting in part). Thus, a change in the plaintiff's conditions of confinement—even the imposition of conditions that might not initially have amounted to a serious deprivation—does not eliminate the plaintiff's Eighth Amendment claim, given the previous prolonged deprivation and the indefinite nature of the plaintiff's continued confinement to medical keeplock.

### b. *Deliberate Indifference*

 A finding of "deliberate indifference" does not require "conduct undertaken for the very purpose of causing harm." *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). The Supreme Court has recently concluded that "deliberate indifference" exists when a prison official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan*, —— U.S. ——, ——, 114 S.Ct. 1970, 1984, 128 L.Ed.2d 811 (1994). The district court concluded that the plaintiff was substantially likely to show that prison officials had acted with deliberate indifference, based on "the awareness of the defendants of the undisputed conditions and harm to the plaintiff." *Jolly*, 894 F.Supp. at 748.

In challenging the district court's conclusion, the defendants note only that because the DOCS TB control program "was implemented in order to protect inmates from a potentially fatal disease," the plaintiff cannot show the required "wanton or callous state of mind." Appellants' Br. at 36. The defendants' argument misses the point. The plaintiff does not challenge the DOCS testing policy; rather, the plaintiff challenges his continued isolation in medical keeplock. The cases the defendants bring to our attention—cases supporting the proposition that TB screening, other testing, or mandatory inoculations do not violate the Eighth Amendment because the requisite state of mind is absent—are therefore inapposite. *See, e.g., Zaire v. Dalsheim*, 698 F.Supp. 57, 59 (S.D.N.Y.1988) (mandatory diphtheria-tetanus inoculations), *aff'd mem.*, 904 F.2d 33 (2d Cir.1990); *Johnson v. Keane*, No. 92 Civ. 4287 (PKL), slip. op. at 13 (Magistrate's Report and Recommendation, S.D.N.Y. Apr. 30, 1993) (mandatory TB screening), *adopted*, 1994 WL 37790 (S.D.N.Y. Feb. 9, 1994). The plaintiff claims that he has suffered physical harm from the conditions and duration of his confinement; as noted *infra* Section II.C, we do not find persuasive the defendants' submissions—offered only after the district court's ruling—urging a contrary conclusion. On the record before us, the district court's finding that the defendants were aware "of the undisputed conditions and harm to the plaintiff" is not clearly erroneous. We therefore agree that the plaintiff has, for purposes of this stage of the proceedings, satisfied the subjective prong of the Eighth Amendment inquiry.

In sum, the plaintiff has shown a substantial likelihood of success on the merits of his Eighth Amendment claim. We find that prospective relief remains appropriate despite the apparent change in DOCS's policy on conditions of medical keeplock.

### C. *Irreparable Harm*

██ The district court concluded that continuing to hold the plaintiff in medical keeplock would result in irreparable harm, offering three independent findings to support that conclusion: (1) the plaintiff has alleged a constitutional violation; (2) the plaintiff has alleged harm that cannot be adequately compensated monetarily; and (3) the plaintiff manifests physical effects of his confinement in medical keeplock, including his inability to stand without difficulty, rashes, headaches, shortness of breath, and hair loss. *Jolly*, 894 F.Supp. at 740.

The defendants challenge the district court's conclusion on two grounds. The defendants first argue that the plaintiff has failed to demonstrate a constitutional violation, because the plaintiff's Eighth Amendment rights have not in fact been violated and the plaintiff's free exercise claim is statutory rather than constitutional. As discussed *supra* Section II.B.2, we agree with the district court that the plaintiff has shown a substantial likelihood of success on his Eighth Amendment claim. The district court therefore properly relied on the presumption of irreparable injury that flows from a violation of constitutional rights. In any event, it is the *alleged* violation of a constitutional right that triggers a finding of irreparable harm. *See Covino v. Patrissi*, 967 F.2d 73, 77 (2d Cir.1992); *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir.1984). In addition, although the plaintiff's free exercise claim is statutory rather than constitutional, the denial of the plaintiff's right to the free exercise of his religious beliefs is a harm that cannot be adequately compensated monetarily. *See LeBlanc–Sternberg v. Fletcher*, 67 F.3d 412, 426 (2d Cir.1995); *see also Paulsen v. County of Nassau*, 925 F.2d 65, 68 (2d Cir.1991). Courts have persuasively found that irreparable harm accompanies a substantial burden on an individual's rights to the free exercise of religion under RFRA. *See, e.g., Alameen*, 892 F.Supp. at 447–48; *Luckette v. Lewis*, 883 F.Supp. 471, 483 (D.Ariz.1995).

The defendants also challenge the district court's finding that the plaintiff's confinement resulted in, and would continue to result in, physical injury. The plaintiff submitted a sworn statement that he suffers from headaches, hair loss, rashes, and an inability to walk without difficulty. As of the date of the district court's initial ruling, the defendants had submitted nothing to oppose the plaintiff's claims. In support of motions for reargument and relief from judgment, the defendants submitted affidavits of DOCS staff members who had observed the plaintiff's physical condition, as well as the plaintiff's health records for September 7, 1994, through March 9, 1995. We do not find that these materials cast doubt upon the plaintiff's claims to have sustained physical injuries from his prolonged confinement to his cell without exercise. Indeed, the health records indicate that the plaintiff complained on various occasions of headaches, a skin condition, and back pain. The defendants will have the opportunity at trial to demonstrate more fully that the plaintiff's claims of injury are not tenable. On the record before us, however, the district court's finding that the plaintiff had suffered physical injury is not clearly erroneous. The district court's findings that the plaintiff is substantially likely to demonstrate a violation of his Eighth Amendment rights, that the plaintiff is substantially likely to demonstrate a violation of his right to the free exercise of his religious beliefs, and that the plaintiff has suffered physical effects of his confinement each serve as an independent basis for the district court's conclusion that the plaintiff would suffer irreparable harm in the absence of preliminary injunctive relief.

### III. *CONCLUSION*

We have considered the remainder of the defendants' objections to the district court's decision and find them to be without merit. We therefore conclude as follows:

(1) The plaintiff has demonstrated a substantial likelihood of success on the merits of his RFRA claim;

(a) At this stage of the proceedings, the plaintiff has made the requisite showing that the policy of placing in medical keeplock prisoners who refuse to submit to a TB screening test constitutes a substantial burden on his right to the free exercise of his religious beliefs;

(b) The defendants have failed to establish that the confinement of the plaintiff to medical keeplock is the least restrictive means to further a compelling state interest.

(2) The plaintiff has demonstrated a substantial likelihood of success on the merits of his Eighth Amendment claim;

(a) At this stage of the proceedings, the plaintiff has made the requisite showing that his prolonged confinement to medical keeplock without exercise constitutes a serious deprivation of basic human needs; the defendants' change in policy does not cure this serious deprivation.

(b) The district court's finding that the defendants have acted with deliberate indifference is not clearly erroneous.

(3) The district court's conclusion that the plaintiff would suffer irreparable harm in the absence of an injunction is supported by three different findings: that the plaintiff is substantially likely to establish a violation of his Eighth Amendment rights, that the plaintiff is substantially likely to demonstrate a violation of his right to the free exercise of his religious beliefs under RFRA, and that the plaintiff suffers from the physical effects of his prolonged confinement.

In sum, the district court did not abuse its discretion in awarding preliminary relief in this case. Accordingly, we affirm.